UNITED STATES ex rel. VON KLECZ-
KOWSKI et al. v. WATKINS, District Di-
rector of Immigration and Naturalization.

District Court, S. D. New York.
April 22, 1947.

430

Louis Waldman and Gunther Jacobson, both of New York City, for relators.

John F. X. McGohey, U. S. Atty., and David McKibbin and Harold J. Raby, Asst. U. S. Attys., all of New York City, for respondent.

RIFKIND, District Judge.

In 1785 James Madison could adduce, in opposition to a bill pending in the General Assembly of Virginia, the argument that

"It will have a * * * tendency to banish our Citizens. The allurements presented by other situations are every day thinning their number. To superadd a fresh motive to emigration, by revoking the liberty which they now enjoy, would be the same species of folly which has dishonoured and depopulated flourishing kingdoms." See Everson v. Board of Education 67 S.Ct. 504.

Today such an argument is not likely to be heard. To speak of fear of encouraging emigration from the United States is to summon a vanished past. The right to enter the United States and to remain therein has become one to be diligently pursued and devotedly guarded. It is a treasure men do not lightly part with. It is that right which is in issue in this proceeding.

The relators are the subjects of an order of deportation which is challenged by their petition for a writ of habeas corpus. The issues joined by the petition, return and traverse have been tried. The evidence discloses a stage upon which is enacted the drama of war as seen from a neutral corner, tense with the apprehensions of espionage and counter espionage. The scene is laid in Istanbul, Turkey, and there are unfolded the events which are critical in the decision of this controversy.

There is no dispute concerning the events which took place within the United States. On April 22, 1944, the relators, husband and wife, both citizens and natives of Austria, arrived in the United States aboard a military plane, flown by United States military authorities from Cairo to LaGuardia Field, New York. A U. S. military officer accompanied them and, upon arrival, turned them over to representatives of the Immigration Service who lodged them at Ellis Island for a period of four weeks. Thence they were removed to Camp Algiers, an internment camp for enemy aliens, and detained eighteen months. In January, 1946, their internment as enemy aliens was terminated and they were at once served with warrants of arrest in deportation proceedings and taken into custody by immigration officials. On February 15, 1946, hearings began before an Immigration Inspector. On October 3, 1946, relators were ordered deported by the Board of Immigration Appeals. Applications for voluntary departure and preexamination were denied. On November 20, 1946, the Attorney General affirmed. The order provided for deportation to Turkey, if practicable, otherwise to Austria.

At the time of their arrival, the relators were not in possession of formal visas.

The respondent justifies the detention of the relators by the order of deportation and justifies that order by their lack of visas upon arrival.

I. *Relators claim that they are legally entitled to remain in the United States by virtue of an agreement binding upon the United States and made by the relators with a duly authorized agent of the United States.*

With respect to this contention there is a lack of correspondence between the allegation of the petition and the proof adduced by relators. The petition alleged that the relators, members of the German Army Counter-Intelligence Organization called Abwehr, stationed in Istanbul, Turkey, from 1941 to February, 1944, assisted the Allies by giving information to George W. Earle, a special envoy of President Roosevelt, and George Britt, Chief of the American Office of War Information at Istanbul; that Earle and Britt agreed, in consideration of the services of the relators, that the United States Government would furnish them "all protection guarantying relators' lives which said government would be able to furnish"; that on February 7, 1944, relators having received orders from the German Government to report in Berlin within a week, Britt and relators amended the aforesaid agreement "to the effect that relators would at once be taken to the United States via Cairo; that the relators were thereafter to reside in the United States during their, relators', pleasure; that relator Karl von Kleczkowski would upon arrival be employed in a suitable position by the United States government * * *"; and that Earle had authorized Britt to make such a promise and that President Roosevelt had authorized Earle.

The evidence given on behalf of the relators was quite wide of these allegations.

Earle testified that very shortly after he had met the relators and before he introduced them to Britt, he told them that, if the President approved, they could come into the country permanently in return for their service; and thereafter he informed them that [1] the President approved. Von Kleczkowski testified that on November 4, 1943, Earle stated, "It is all settled for you, you can go—you are allowed to go to America"; and that thereupon Earle wrote out and delivered to him a letter, the text of which is as follows:

"Nov. 4, 1943.
"Embassy of the United States
of America
"Office of the Naval Attache
"Turkey

"To whom it may concern:

"Should the activities of Dr. Karl von Kleczkowski be questioned by the Turkish or United Nations authorities please com-

---

[1] Earle testified that he had an arrangement with the President whereby he, Earle, could take any action he thought advisable, provided he first communicated his intention to the President and received no word of disapproval.

municate immediately with Lieut.Comdr. George H. Earle, Asst. United States Naval Attache, Istanbul, Turkey.

"George H. Earle
"Home telephone—Park Hotel
"Office telephone—44981"

Von Kleczkowski further testified, "He gave us this letter and said, 'Well, now, this is your visa.' He said it laughingly and, of course, now the rest is highly emotional. I mean, for us it was—it was the greatest thing we could think of."

Mrs. Von Kleczkowski corroborated her husband.

George Britt testified on behalf of relators. His testimony was clear, coherent and credible. I find myself persuaded to accept his version of the events in controversy. At the close of his direct examination the court addressed two questions to him and he returned the following answers which I accept as true:

"Q. Did you ever promise Von Kleczkowski the privilege of entering into permanent residence in the United States? A. No, Sir, I had no such authority.

"Q. Did Governor Earle ever tell you that he had made such a promise to them? A. No, Sir, we did not discuss that."

In general, his testimony was that he first met the relators, through Earle's introduction, early in November, 1943. At the very first meeting they inquired concerning the help Britt could give in the event the Germans discovered their duplicity. He assured them that he would do whatever he, personally, could do to prevent their return to Germany. Early in February, 1944, the relators informed him that they had been ordered to Berlin. At the same time two officers of the Office of Strategic Services, acting independently, asked Britt whether he was in touch with any German agents who could be induced to place themselves in their hands so as to "keep the ball rolling of defection from the German organization." He communicated this invitation to the relators. They accepted. The immediate destination was to be Egypt. Britt did not recall any long term arrangement concerning the disposition of the relators. As far as he was concerned, "They were sent to Cairo for the purpose of saving their lives by getting them out of German hands." The relators never mentioned to him any promise by Earle of permanent residence in the United States. As to their future employment, Britt and the relators discussed the probabilities of their working in the United States but he "made no arrangements with them."

In considering whether the evidence justifies a finding that the relators were the beneficiaries of a promise of permanent residence in the United States consideration must be given to the following circumstances:

1. There is a sharp and irreconcilable variance between the allegations of the petition and the proof. Specifically, as late as December 19, 1946, they had not yet asserted that Earle had promised them admission. They attributed the promise to Britt. Only after Britt had repudiated this claim and Earle had accepted the role of promisor, did relators testify that Earle had made the promise.

2. Although Earle, by reason of his frequent departures from Istanbul, turned the relators over to Britt, he never informed the latter that he had promised the relators admission to the United States for permanent residence.

3. Although there were discussions between the relators and Britt about the possibility of their going to the United States, they never mentioned any such promise on the part of Earle; and Britt never made such a promise.

4. Relators were in Cairo two months, during which time they were extensively questioned by military authorities. There is no evidence that they ever declared to anyone that they had a promise from either Earle or Britt of admission to the United States for permanent residence.

5. During the internment of the relators at Camp Algiers, von Kleczkowski wrote several letters to the War Department and to the Alien Enemy Control Unit. Therein he mentioned Earle's letter of November 4, 1943, and called it a "letter of recommendation." He never made reference to any promise of admission to the United States.

6. On May 19, 1944, von Kleczkowski wrote from Ellis Island to the State Department, describing the discussion in Istanbul, but made no mention of a promise of admission to the United States.

7. During the hearing before the Immigration Inspector, at which they were represented by counsel, relators made no mention in their testimony of any promise of admission to the United States, although the warrant of arrest specified the lack of a visa as a ground of arrest.

8. After the close of the hearing, relators moved for its reopening for the reception of Earle's testimony. It was reopened and Earle testified that he had promised, in return for their services, to "do everything in my power to see that they were treated fairly." Earle had been told by relators' attorney that the lack of a visa was the asserted ground for the deportation proceeding. Nonetheless he made no reference in his testimony to a promise for their admission into the United States for permanent residence.

9. The presiding inspector made findings of fact and conclusions of law, including that relators were deportable for lack of a visa. Exceptions were filed in an affidavit by von Kleczkowski in which he contended that the Immigration Law did not apply because he was brought into the United States by the military authorities. He did not assert a promise or agreement for the admission of the relators into the United States for permanent residence.

10. At the oral argument on May 22, 1946, before the Board of Immigration Appeals, the attorney for the relators submitted an affidavit of Mr. Earle, verified April 29, 1946, drafted by the attorney and revised by Mr. Earle. The affidavit is annexed to the return. After reciting the services rendered by the relators in behalf of the Allies, the affidavit continues:

"In view of the service rendered by the Kleczkowskis, I promised them our assistance when their position should become unbearable. Originally the thought was to keep them in Turkey as political refugees if the Germans should demand their extradition. When finally the German government demanded the return of the Kleczkow-skis in February 1944, for probably [sic] execution, I assisted Mr. Britt in taking the Kleczkowskis out of Turkey to Egypt.

"As I knew that it would be difficult for the Kleczkowskis to establish their demand for recognition by our government after their separation from Istanbul where those who knew them were located, I gave them on November 4, 1943, a letter of protection. I understand that this letter has been taken from them, whereby the purposes for which it was given, were defeated.

"In view of the foregoing I do not hesitate to state that I consider the Kleczkowskis persons of excellent moral character, loyally disposed towards the United States; that I consider their contribution to our war effort considerable and of such importance as to obligate our government to a sign of appreciation. I therefore, recommend that the Kleczkowskis be granted the privilege of preexamination."

It is to be noted that it is barren of any suggestion of a promise of admission into the United States.

11. Jacobson, one of relators' attorneys, testified that the first time he asserted in these proceedings that there was an agreement made between Governor Earle and the relators for their admission to the United States for permanent residence was on May 22, 1946, in a brief filed with the Board of Immigration Appeals. The language to which he referred reads:

"It is clear that our government in the exercise of its war powers invited the respondents to come to this country, and to enter this country permanently and to remain in this country."

Manifestly this language did not assert the existence of an agreement. Rather it drew a legal inference from a circumstance of relators' mode of arrival.

▮ In the light of all these circumstances I am driven to the conclusion that no promise of admission to the United States was ever made to the relators by Earle or by Britt; that the claim of such a promise is of recent invention born out of the necessities of the litigation.

This conclusion involves rejection of Earle's testimony. I do that reluctantly. It should be noted, however, that on three sep-

arate occasions he testified in substance, "I regret my memory; I had a good deal of things on my mind. I cannot remember everything accurately."

In view of this determination it is unnecessary to consider whether such an agreement, if made, would bind the United States.[2]

## II. Do the relators belong to a class made deportable by statute?

1. "Any alien who at any time after entering the United States is found to have been at the time of entry not entitled under this chapter to enter the United States, * * * shall be taken into custody and deported * * *." 8 U.S.C.A. § 214.

2. "No immigrant shall be admitted to the United States unless he (1) has an unexpired immigration visa." 8. U.S.C.A. § 213(a).

3. "When used in this chapter the term 'immigrant' means any alien departing from any place outside the United States destined for the United States, except * * *." [None of the exceptions is relevant.] 8 U.S.C.A. § 203.

■ The sum of this statutory language is that the relators were (1) immigrants, (2) not admissible because not in possession of visas, and (3) therefore, deportable because at the time of entry they were not entitled to enter the United States.

This conclusion is challenged by the relators on the ground that (1) they came into the United States on the invitation of the government, or (2) they were brought into the United States involuntarily by the government. Neither state of facts avails the relators. United States ex rel. Ling Yee Suey v. Spar, 2 Cir., 1945, 149 F.2d 881; Werblow v. United States, 2 Cir., 1943, 134 F.2d 791, 792.

■ Nor is there any substance in the suggestion that Earle's letter of November 4, 1943, constituted a visa. Earle did not intend it to be a visa. There was a regular visa-issuing office in Istanbul. The functions of this office were never transferred by the President to Assistant Naval At-taches under section 1 of the First War Powers Act, 1941, 50 U.S.C.A.Appendix § 601.

## III. Were the relators afforded a fair hearing?

Kwock Jan Fat v. White, 1920, 253 U.S. 454, 40 S.Ct. 566, 64 L.Ed. 1010, arose under the Chinese Exclusion Laws. The issue in that case was whether the relator was a native citizen of the United States. It held that the decision of the Secretary of Labor was final unless the proceedings were "manifestly unfair," were "such as to prevent a fair investigation" or showed "manifest abuse" of the discretion committed to him or that his authority was exercised inconsistently with due process of law.

■ In the case at bar, too, the decision of the Attorney General is final unless the proceedings leading thereto are infected with the kind of unfairness the Supreme Court had indicated. Relators were afforded all the hearings which the statute and the regulations prescribe. They were at all times represented by counsel. No complaint is made concerning the conduct of the hearings before the Immigration Inspector or the Board of Immigration Appeals. Unfairness is attributed only in the five following respects:

(1) That the immigration laws were unlawfully applied to the relators. For reasons already stated no unfairness was involved in treating the relators as immigrants under the law.

(2) That an erroneous finding was made that relators were without passports upon their arrival. Granting that this finding was erroneous, no prejudice resulted since the finding that relators were without visas adequately supported the conclusions.

(3) That the Attorney General considered evidence not in the record of the hearings, and not disclosed to the relators, on the questions of voluntary departure and preexamination. Respondent admits that the Attorney General had recourse to a report of one Major Tilly made for the Office of Strategic Services and based large-

---

[2] Respondent has not raised the question whether such an agreement can be pleaded without violating the rule of Mitchell v. Harmony, 1851, 13 How. 115, 14 L.Ed. 75.

ly on the interrogation and investigation of the relators during their stay in Cairo in the custody of the military authorities. This raises a question of substance (cf. Kwock Jan Fat v. White, 1920, 253 U.S. 454, 464, 40 S.Ct. 566, 64 L.Ed. 1010); but I have concluded that the objection is without merit for the following reasons.

The privilege of voluntary departure is derived from 8 U.S.C.A. § 155(c), which provides:

"In the case of any alien * * * who is deportable under any law of the United States and who has proved good moral character for the preceding five years, the Attorney General may (1) permit such alien to depart the United States to any country of his choice at his own expense, in lieu of deportation * * *."

Preexamination is governed by regulation; Title 8, Part 142, Code of Federal Regulations, Cum.Supp.

█ The language of § 155(c) is clear that discretion to grant or withhold the privilege of voluntary departure is vested in the Attorney General; and it has been authoritatively held that his decision is not subject to judicial review. U.S. ex rel. Salvetti v. Reimer, 2 Cir., 1939, 103 F.2d 777, 779. This, however, does not dispose of the matter. In the last cited case the court said:

"We may assume, without the necessity of decision, that the requirements of a fair hearing must be observed by the board during its consideration of the aliens' request and that a decision based on charges which they had no opportunity to refute would be unfair."

█ One aspect of the proposition which the court assumed without deciding now demands decision. The narrow limits of that question are whether the Attorney General, on an application for review of a decision of the Board of Immigration Appeals denying discretionary relief to an enemy alien in time of war, may consider a report of the military authorities, classified in part "secret" and in part "top secret,"[3] without disclosing it to the alien and without it having been part of the record of the deportation hearing. No precise authority has been called to my attention. I have come to the conclusion that, in the circumstances stated, the action of the Attorney General did not render the proceedings unfair. It should be noted that no deportable alien can claim voluntary departure or preexamination as of right. Even if the alien satisfies all the conditions of the regulations (Code of Fed.Reg., Title 8, Part 150 § 150.6(g); Part 142), he thereby accomplishes no more than establish his eligibility to discretionary relief. Whether relief is to be granted still rests in the discretion of the Attorney General. To this extent the instant situation is sharply distinguishable from cases where citizenship or deportability is in issue. United States v. Dunton, D.C., S. D.N.Y.1923, 291 F. 905; Kwock Jan Fat v. White, supra.

In Bridges v. Wixon, 1945, 326 U.S. 135, 156, 65 S.Ct. 1443, 1453, 89 L.Ed. 2103, the court said:

"In these habeas corpus proceedings the alien does not prove he had an unfair hearing merely by proving the decision to be wrong (Tisi v. Tod, 264 U.S. 131, 133, 44 S.Ct. 260, 68 L.Ed. 590), or by showing that incompetent evidence was admitted and considered. Vajtauer v. Commissioner, supra, 273 U.S. 103, 106, 47 S.Ct. 302, 71 L. Ed. 560. But the case is different where evidence was improperly received and where but for that evidence it is wholly speculative whether the requisite finding would have been made. Then there is deportation without a fair hearing which may be corrected on habeas corpus."

The court emphasized that it was dealing with the issue of deportability of a resident alien who had entered *lawfully*. It was not

---

3 "Documents, information, or material, the unauthorized disclosure of which would endanger national security, cause serious injury to the interests or prestige of the nation, or any governmental activity thereof, or would be of great advantage to a foreign nation shall be classified secret.

"Certain secret documents, information and material, the security aspect of which is paramount, and whose unauthorized disclosure would cause exceptionally grave damage to the nation shall be classified top secret."

Army Regulations, AR 380—5.

addressing itself to the issue of discretionary relief. Moreover, in the case at bar both the examining inspector and the Board of Immigration Appeals had recommended the denial of discretionary relief without recourse to the Tilly report. One would have to be unduly naive to suppose that, without that report, the denial of discretionary relief was not supported by the record.

In the light of the considerations that there is grave doubt that any power of review exists with respect to the grant or denial of "discretionary relief," that the relators are enemy aliens, that the Attorney General acted in time of war, that the withheld documents were classified by the military authorities as secret and top secret and finally that it is highly likely that, regardless of the Tilly report, the same finding would have been made, I conclude that the proceedings were not infected with unfairness by the Attorney General's recourse to the undisclosed report.

[8] (4) That the regulation governing preexamination was amended during the proceedings. At the time of the hearings eligibility was governed by . Part 142 of Title 8, Code of Federal Regulations, Cum. Supp.

Section 142.1 provided:

"§ 142.1 Preexamination; who may apply. Any alien, other than a Canadian citizen, who has been within the United States for a period of six months or more and who intends to apply to a consular officer of the United States in Canada for an immigration visa for entry into the United States for permanent residence may, subject to the provisions of this Part, apply for the privilege of a preexamination by officers of the Immigration and Naturalization Service for the purpose of determining in advance his admissibility into the United States for permanent residence when in possession of an unexpired immigration visa".

Section 142.2 provided:

"§ 142.2 Preexamination; aliens eligible. Preexamination shall not be authorized unless it appears to the officer granting such authorization that the alien is:

"(a) Admissible to Canada;

"(b) Of good moral character;

"(c) Registered and/or fingerprinted as required by the Alien Registration Act, 1940; and

"(d) Able to obtain the prompt issuance of an immigration visa in case it is determined that he is admissible to the United States for permanent residence."

On May 22, 1946, after the hearing but before the decision by the Board of Immigration Appeals, section 142.1 was amended to read as follows (11 F.R. 5538):

"§ 142.1 Preexamination; who may apply. An alien who is a member of any of the following classes and who intends to apply to a consular officer of the United States in Canada for an immigration visa for entry into the United States for permanent residence may, subject to the provisions of this part, apply for the privilege of a preexamination by officers of the Immigration and Naturalization Service for the purpose of determining in advance his admissibility into the United States for permanent residence when in possession of an unexpired immigration visa:

"(a) An alien—other than a citizen of Canada, Mexico, or any of the islands adjacent to the United States—who has been within the United States for a period of one year or more and who has a spouse, parent, or minor child, who is in the United States and is a citizen thereof or is a lawfully permanent resident alien;

"(b) An alien—other than a citizen of Canada, Mexico, or any of the islands adjacent to the United States—who has resided in the United States for a period of five years or more; or

"(c) An alien—other than a citizen of Canada—whose case is found to be an exceptionally meritorious case."

Section 142.2 was left intact.

The presiding inspector found that the relators had failed to establish affirmatively that they had been persons of good moral character during the preceding five years. That finding was evidently keyed to the request for voluntary departure under Section 155(c) of Title 8 U.S.C.A.

The Board of Immigration Appeals on October 3, 1946, found the cases of the relators were not exceptionally meritorious.

No changes occurred in the law governing voluntary departure. Without the right of voluntary departure, the opportunity for preexamiantion would lead only to an empty ceremonial. Assuming, without deciding, that relators were entitled to have their applications decided under the unamended rules, they have, in fact, been deprived of nothing of value.

Relators make the further objection that the finding of absence of exceptional merit should have been referred back to the district director so that the relators might be given the opportunity to file exceptions. They rely upon section 90.11. But that regulation by its terms applies to cases where the Board of Immigration Appeals proposes to enter an order less favorable to the alien than that proposed by the presiding inspector. That was not the case here.

(5) That the Attorney General prejudged the relators' application for discretionary relief.

■ The fairness of the proceedings is challenged on the ground that the Attorney General had prejudged the result. This is supported by evidence so flimsy as not to warrant discussion.

*IV. Relators having once been interned as enemy aliens, is the Attorney General barred from deporting them?*

■ The argument is advanced that the relators are not deportable because the Attorney General had heretofore caused their internment as enemy aliens. Enemy aliens, ordered removed from the United States, have the choice of voluntary departure, 50 U.S.C.A. § 21; United States ex rel. Heyman v. Watkins, 2 Cir., 159 F. 2d 650. The President, however, has not ordered the removal of the relators under the Alien Enemy Act. Removal is by no means the inevitable consequence of internment. An enemy alien may be subject to removal though he is not subject to deportation. Conversely an alien may be subject to deportation though he is not subject to removal. I see no reason why an enemy alien who qualifies under the deportation statute and the Alien Enemy Act may not be subjected to deportation or removal as the Attorney General elects. Here the internment was terminated before the deportation proceedings were begun. There is nothing in the internment which immunized the relators against deportation.

*V. The Right of Asylum.*

■ I have been able to find but one case which, after the establishment of the quota system, gives any recognition to the concept of asylum; and the facts of that case are not present in the case at bar. United States ex rel. Weinberg v. Schlotfeldt, D.C.,N.D.Ill. 1938, 26 F.Supp. 283, disapproved, Soewapadji v. Wixon, 9 Cir., 1946, 157 F.2d 289, 290 certiorari denied 67 S.Ct. 369. All the other relevant authorities point the other way. Ex parte Kurth, D.C.,S.D.Cal.1939, 28 F.Supp. 258, appeal dismissed, 9 Cir., 106 F.2d 1003; United States ex rel. Giletti v. Commissioner, 2 Cir., 1929, 35 F.2d 687; United States ex rel. Fortmueller v. Commissioner, D.C.,S.D.N.Y.1936, 14 F.Supp. 484; United States ex rel. Hudak v. Uhl, D.C.,N.D.N.Y. 1937, 20 F.Supp. 928, affirmed no opinion, 2 Cir., 96 F.2d 1023.

There is no evidence that it would be unsafe for the relators to return to Austria and not even a suggestion that it would be unsafe for them to go to Turkey.

*VI. Admissibility of Certain Exhibits.*

■ A number of statements written by the relators while under interrogation by the military authorities in Cairo were offered in evidence and received subject to a motion to strike on the ground that the statements were obtained under duress. Professor Wigmore (Wigmore on Evidence, 3rd Edition, volume 4, § 1050 and volume 3, § 815) states the rule to be that, in a civil case, duress is not a ground for the exclusion of a statement; it goes only to affect the weight. He cites some authorities to the contrary. In the instant case the statements are relevant, if at all, only on the issue of credibility. I find no occasion to reexamine the validity of the rule as stated by Wigmore for the reason that the internal character of the statements has persuaded me to assign no weight whatever to them on the issue for which they were received.

438

I have decided to overrule Relators' objection to the reception of Major Tilly's report in evidence. This document was offered not as proof of its contents but to refute the charge that the Attorney General acted arbitrarily in denying discretionary relief to the relators. Relators founded one of their objections to the administrative proceeding on the ground that the Attorney General had access to this report. I see no possible prejudice to the relators in admitting it for the limited purpose for which it was offered.

## VII. The moral issue.

The moral issue is manifestly not before the court. I would not speak of it at all except for the vigor and eloquence with which it has been presented. Counsel should have the satisfaction of knowing that it has not been overlooked. Suffice it to say that Congress has not entrusted to the courts, in the immigration laws, the power to weigh the merit or demerit of those who knock at our doors for admission, or of those who are found, by fair administrative proceedings, to be deportable. The solitary exception (8 U.S.C.A. § 155(a) only confirms the generality of the rule. The power so specifically withheld was not conferred by the general language of the Administrative Procedure Act, Public Law 404, 79th Congress, Sec. 10(e), 5 U.S.C.A. § 1009(e).

Whether the relators' defection from the German cause was motivated by a wholesome revulsion against Nazism or was stimulated by the turn in the tide of battle is a problem which will not be resolved in these proceedings. As for the argument that regardless of the absence of a promise, the relators' services entitle them to admission into the United States, it need only be said that the immigration authorities could well consider that on all the continents are many humble citizens who served our cause and who by reason thereof suffered far greater cruelties than any to which the relators have been exposed and as yet Congress has taken no step to facilitate their entry.

The writ is dismissed and the relators remanded to the custody of the respondent.