Efstratios **SAVELIS**, Theodoros Fragidokis, and Photios Theofanou, Petitioners,

v.

E. **VLACHOS**, Master of the Greek S. S. Michalakis, E. O. Douglas, Jr., Immigration Inspector at Newport News, Virginia, Paul E. Johnson, Supervisory Immigration Officer at Norfolk, Virginia, and T. A. Esperdy, Deputy Regional Commissioner of Immigration at Richmond, Virginia, and Gilbert Zimmerman, Immigration Service, Richmond, Virginia, Respondents.

Misc. No. 460.

United States District Court
E. D. Virginia, Newport News Division.

Nov. 25, 1955.

Morewitz & Morewitz, Newport News, Va., Jacob L. Morewitz, Newport News, Va., for petitioners.

William F. Davis, Asst. U. S. Atty., Norfolk, Va., and Gilbert Zimmerman, Richmond, Va., Regional Counsel for the Immigration and Naturalization Service, for the Government respondents.

Vandeventer, Black & Meredith, Hugh Meredith and Walter B. Martin, Jr., Norfolk, Va., for the Master and shipowner respondents.

HOFFMAN, Judge.

The three petitioners herein were, at the time of their arrival in this country, bona fide alien crewmen employed on board the Greek vessel Michalakis. The vessel was involved in a collision with a United States Navy ship on or about the 17th day of October, 1955, and immediately went to a shipyard at Newport News for repairs.

Petitioner, Savelis, applied for a writ of habeas corpus, an application for a declaratory judgment and/or an injunction in a proceeding instituted in this Court on November 1, 1955. Counsel for petitioner stated to the Court that the petitioner was not then being detained by the Immigration authorities or the Master of the vessel, but petitioner never-

theless insisted upon the issuance of an order to show cause on the petition for writ of habeas corpus. No notice of any hearing on an application for temporary injunction was given (although the pleading requested an injunction) and, for this reason, no hearing was scheduled. This Court declined to issue the order to show cause for the reason that petitioner admittedly was not being detained at the time. At the request of counsel for petitioner, the file in that case was forwarded to Chief Judge John J. Parker of the Circuit Court of Appeals for the Fourth Circuit. In a brief order the action of the District Court was affirmed, with the right reserved to petitioner to apply to the full Court for an order in the nature of a writ of mandamus. The Circuit Court of Appeals has not acted on petitioner's request. The District Judge therefore assumes that his action in refusing to sign the order to show cause was proper. It will be noted that the District Court was not requested to rule upon any phase of this case except the matter affecting habeas corpus, and the Court expressly reserved consideration of the declaratory judgment issue. Had a specific request, accompanied by a proper notice, been made as to a temporary injunction, this Court would have granted a hearing.

On November 9, 1955, the three petitioners, one of whom was the petitioner in the prior action, were taken into *actual physical custody* by the Immigration officials pursuant to 8 U.S.C.A. § 1282(b). Upon such showing on November 10, 1955, this Court issued an order to show cause on petitioners' application for habeas corpus, declaratory judgment and/or injunction. Notice of a request for temporary injunction was given the respondent Immigration officials and the Master of the vessel. The order to show cause and request for temporary injunction were made returnable at 3 P. M. on November 11, 1955, and the hearings followed.

Respondent Immigration authorities urge the legality of petitioners' detention under 8 U.S.C.A. § 1282(b), which is as follows:

"Pursuant to regulations prescribed by the Attorney General, any immigration officer may, *in his discretion,* if he determines that an alien is not a bona fide crewman, *or does not intend to depart on the vessel or aircraft which brought him,* revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a) (1) of this section,[1] take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practicable, and such crewman shall be deported from the United States at the expense of the transportation line which brought him to the United States. Until such alien is so deported, any expenses of his detention shall be borne by such transportation company. Nothing in this section shall be construed to require the procedure prescribed in section 1252 of this title to cases falling within the provisions of this subsection."[2]

While the initial question concerned only the legality of petitioners' detention, the vessel left this country on November 12, 1955, and hence the ultimate question in this case as to the declaratory judgment and/or injunction is now before the Court and is admittedly far-reaching. The issue strikes at the discretionary power vested by Congress in the Immigration officers and the Attorney General's regulations prescribed. Title 8, U.S. C.A. § 1282(a) (1) and (2) provides:

"(a) No alien crewman shall be permitted to land temporarily in the

---

1. This subsection refers to what is generally referred to as a D–1 permit.

2. Section 1252 provides for a cumbersome procedure relating to the apprehension and deportation of aliens (not alien crewmen), their arrest, custody, and review of determination of status by the Court.

United States except as provided in this section and sections 1182(d) (3), (5) and 1283 of this title.[3] If an immigration officer finds upon examination that an alien crewman is a nonimmigrant under paragraph (15) (D) of section 1101(a) of this title[4] and is otherwise admissible and *has agreed to accept such permit*, he may, in his discretion, grant the crewman a conditional permit to land temporarily pursuant to regulations prescribed by the Attorney General, subject to revocation in subsequent proceedings as provided in subsection (b) of this section, and for a period of time, in any event, not to exceed—

"(1) the period of time (not exceeding twenty-nine days) during which the vessel or aircraft on which he arrived remains in port, if the immigration officer is satisfied that the crewman intends to depart on the vessel or aircraft on which he arrived; or

"(2) twenty-nine days, *if the immigration officer is satisfied that the crewman intends to depart*, within the period for which he is permitted to land, *on a vessel or aircraft other than the one on which he arrived.*"

The so-called conditional permits referred to in section 1282 are commonly classified as D–1 and D–2 permits; the former indicating that the crewman must depart on the vessel on which he arrived; the latter stating that the crewman may depart on a vessel other than the one on which he arrived. It will be noted that Congress, in both instances, imposed a condition precedent to satisfy the Immigration officer of the crewman's intentions. How, then, is this requirement to be satisfied?

The economic effects of this decision could completely demoralize commerce between this nation and foreign countries. To deprive Immigration officers of the discretionary powers vested by Congress would spell disaster to foreign vessels visiting our ports. When and how should a crewman be permitted to signify his intentions? To allow the seaman to wait until immediately prior to the sailing of the vessel and then declare an intention to reship foreign on another vessel would result in foreign vessels' being stripped of their crews and would delay departure at great expense to the transportation company. Certainly this would be the case as to "key" employees. In short, the vessel and its owners would be subjected to unreasonable demands for the settlement of claims having little or no value which, in order to secure departure of the vessel, would have to be paid to assure a full complement of men in the crew.

▇ This Court is fully aware of the fact that seamen are wards of the court and entitled to protection as such. It is also recognized that Immigration officers are at times inclined to be arbitrary and unreasonable, thus leading to discriminatory acts in isolated instances.

3. The quoted sections of 1182 are not applicable. Section 1182(d) (3) makes provision for an alien applying for a nonimmigrant visa. Section 1182(d) (5) vests in the Attorney General certain discretionary parole rights for emergent or public interest reasons. Section 1283 has reference to an alien crewman afflicted, or suspected of being afflicted, with feeble-mindedness, insanity, epilepsy, tuberculosis, leprosy, or any dangerous contagious disease. No such contention is made in this case.

4. Section 1101(a) (15) (D) is as follows: "The term 'immigrant' means every alien except an alien who is within one of the following classes of nonimmigrant aliens——

\*　\*　\*　\*　\*

"(D) an alien crewman serving in good faith as such in any capacity required for normal operation and service on board a vessel (other than a fishing vessel having its home port or an operating base in the United States) or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft *on which he arrived* or some other vessel or aircraft".

However, this is not a case apparently falling within this classification. The issue, simply stated, is this:

"May an alien crewman, having previously been granted and having accepted a D–1 conditional permit, thereafter change his mind and elect not to depart on the vessel on which he arrived and, without satisfying the Immigration officer as to his ability to reship foreign on another vessel within the 29 day period, demand the issuance of a D–2 conditional permit?"

As to this issue the evidence presented is not in dispute. The three petitioners retained the same counsel. None of them furnished any oral or written statement indicating his ability to reship foreign on another vessel within the 29 day period. One petitioner, Fragidokis, testified that he held a letter from the Assistant Engineer of the Michalakis permitting him to obtain employment on another vessel owned by the same transportation company. The letter was never exhibited to the Immigration officials, nor were its contents mentioned by the petitioner, although Fragidokis stated that his counsel knew of the letter. The letter was not introduced in evidence. In short, there is no contention by any of the petitioners or their counsel that any oral or written statement was made indicating their ability to reship foreign at any time. The sole contention urged is that any alien crewman has an absolute right to accept a D–1 permit and thereafter, at any time prior to the sailing of the vessel, the alien crewman may insist upon a change of status and obtain a D–2 permit without indicating any evidence of his ability to reship foreign within 29 days. If such is the law, there would be no need for the use of D–1 permits. They would, in effect, be meaningless.

■■ This case is one of a series of similar actions instituted by the same counsel representing different Greek seamen. To prevent this question from being moot, the Court elected to hold the petitioners in this country pending determination of the habeas corpus and declaratory judgment proceedings. Since the vessel has left the country, it is likely that the issues involving habeas corpus and injunction have become moot, but the Court will discuss the same together with the declaratory judgment proceeding. That petitioners are entitled to have their status determined in a declaratory judgment action, even though they may have left the country, is apparently settled in this Circuit in Kokoris v. Johnson, 4 Cir., 195 F.2d 518.

■ Counsel for petitioners asked leave to traverse the return of the vessel's Master and the answer of the Immigration officials, which leave was granted. The traverse has not been filed but, overlooking the formalities required in pleading, the Court will treat the case as though a general traverse has been filed.

■ The main contention asserted by counsel for petitioners is that paragraph 1 of the "Reservations of the United States" to the 1929 "International Convention for the Safety of Life at Sea", 50 Stat. pt. 2, 1306 (1937), confers on alien crewman a substantive right to land in the United States free of restraint, and permits such crewmen to reship on any vessel. This contention is without merit. The reservation to a treaty or convention confers no substantive rights; it merely serves as a limitation to the provisions agreed upon in the treaty or convention. It is only necessary to examine the provisions of the convention to ascertain that no such substantive rights were conferred. Even if inconsistent with an Act of Congress, the latest in date controls. Lakos v. Saliaris, 4 Cir., 116 F.2d 440, 444; Horner v. United States, 143 U.S. 570, 578, 12 S. Ct. 522, 36 L.Ed. 266; Rainey v. United States, 232 U.S. 310, 316, 34 S.Ct. 429, 58 L.Ed. 617; State of Arizona ex rel. Arizona State Board of Public Welfare v. Hobby, 94 U.S.App.D.C. 170, 221 F.2d 498, 500. If Congress enacts legislation in contravention of the express provisions of an earlier treaty, it is the duty of the Court to uphold such legislation

if it is sufficiently clear and explicit and within the exercise of its constitutional power. Hijo v. United States, 194 U.S. 315, 24 S.Ct. 727, 48 L.Ed. 994. As the Immigration and Nationality Act was enacted by Congress in 1952 and regulations were issued pursuant thereto, it follows that the 1929 Convention would not control the present action but, as previously indicated, there does not appear to be any conflict or any provision of that Convention that would afford petitioners any substantive right.

 Counsel for petitioners insist that the Act of 1952 is unconstitutional. They cite no authority to support this legal theory and, in the opinion of this Court, the contention is again without merit. The Immigration and Nationality Act of 1952 has been construed by many courts in the last three years. At no time has there been any suggestion that the Act is unconstitutional. While the constitutionality of the Act of 1952 does not appear to have been expressly passed upon, the particular sections involved in this case are similar to the Act of 1917, 39 Stat. 874, the constitutionality of which latter Act has been upheld on numerous occasions. The power of the United States to exclude aliens from entering the country is a fundamental element of sovereignty, emanating not only from legislative power but also from the inherent power of the executive to control the foreign affairs of the nation. Any alien who seeks admission to this country may not do so under any claim of right as the privilege of admission is granted only upon such terms and conditions as may be prescribed by Congress. United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317; Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576; Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L. Ed. 956. The constitutionality of the prior Act relating to the control of the admission or detention on board vessels of seamen arriving in the United States has been upheld in Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 29

S.Ct. 671, 53 L.Ed. 1013; The City of Athens, D.C., 73 F.Supp. 362; United States v. Arnold Bernstein S. S. Lines, D.C., 44 F.Supp. 19. It is perfectly apparent that the particular portions of the Immigration and Nationality Act of 1952 which are pertinent to this case in no sense violate the constitutional powers of Congress.

Sec. 252(a) of the Immigration and Nationality Act, 8 U.S.C.A. § 1282(a), expressly places the responsibility upon the Immigration officer to determine whether an alien crewman occupies a bona fide status, ready, able and willing to reship. Upon proper inquiry the Immigration officer "may, in his discretion" grant a D–1 or D–2 landing permit. If granted a D–1 permit, the alien crewman may apply for a change in status to obtain a D–2 permit under Sec. 252.41, Title 8, Code of Federal Regulations, U.S.Code, Congressional and Administrative News, 83rd Congress, 1st Session, 1953, Vol. 2, p. 2596, as follows:

"If the immigration officer to whom an alien crewman applies for change of his landing is satisfied that the alien will depart as a member of the crew of a vessel or aircraft other than the one on which he arrived, he may, in his discretion, grant the alien crewman's request and permit him to remain in the United States for such period as the immigration officer shall determine, not to exceed twenty-nine days from the date of the crewman's arrival in the United States. In such case the immigration officer shall prepare a new set of Forms I–95 and shall note thereon landing under clause (a) (2) of section 252 of the Immigration and Nationality Act (8 U.S.C.A. § 1282) and the date to which the crewman has been granted permission to land. The new Form I–95A shall be given to the crewman and the Form I–95A previously issued to him shall be surrendered. As amended Sept. 30, 1953, 18 F.R. 6235."

 The wording of the Act and the quoted regulation thereunder is plain and

unambiguous. Congress vested certain discretionary powers in the immigration officials, one of which was to require some showing of the alien crewman's intention and ability to reship foreign on another vessel within the required time of twenty-nine days. While it is true that such discretion may be abused in some instances, in the absence of a clear showing of such abuse it is not the function of the Court to substitute its judgment for that of the Immigration official. The Navemar, D.C., 41 F.Supp. 846; United States ex rel. Arkin v. Reimer, D.C., 22 F.Supp. 771; British Empire Steam Navigation Co. v. Elting, 2 Cir., 74 F. 2d 204, certiorari denied 295 U.S. 736, 55 S.Ct. 648, 79 L.Ed. 1684; United States y. National Surety Co., D.C., 20 F.2d 972. In United States ex rel. D'Istria v. Day, 2 Cir., 20 F.2d 302, Judge Learned Hand stated that an alien crewman is only entitled to a summary, but fair, examination by the Immigration officer in determining whether the seaman seeks to enter the country solely in pursuit of his calling or whether he intends to abandon same, and that the burden rests upon the seaman to establish these facts to the satisfaction of the officer. To hold otherwise would literally flood our ports with alien crewmen desiring to avail themselves of extended shore leave and with no reasonable opportunities to reship foreign on another vessel.

■ The recent case of Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868, decided April 25, 1955, casts some doubt as to the extent of judicial review permitted by Sec. 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009. Undoubtedly this case is authority for permitting judicial review of deportation orders in an action for declaratory judgment, whereas Heikkila v. Barber, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972, held that deportation orders were not the subject of judicial review under the Administrative Procedure Act and that habeas corpus was the only remedy available. Heikkila was decided under the Immigration Act of 1917, while Pedreiro involved the Act of 1952. Considering these two cases, as well as Rubinstein v. Brownell, 92 U.S.App.D.C. 328, 206 F.2d 449, affirmed per curiam by an equally divided court in 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421, it appears that the law now existing does not require an actual detention but the validity of the deportation order may be determined by declaratory judgment under the same principles as would be applicable in habeas corpus proceedings if the petitioner had been taken into custody.

■ In the instant case it can hardly be urged that the action of an Immigration official in refusing to grant a change in status from D-1 to D-2 is "final" within the meaning of Pedreiro and Heikkila. The right exists to petitioners to renew their requests at any time prior to the sailing of the vessel upon satisfying the Immigration official of their ability to depart on another vessel. In the absence of clear abuse of discretion there certainly does not appear to be any right of judicial review in such a case. Additionally, such an abuse must be affirmatively stated in the pleadings based upon factual averments rather than upon mere conclusions of law together with vague or ambiguous statements.

■ The petition alleges that the seamen's books and other personal effects were detained on board the vessel. As a matter of fact, the seamen's books were deposited with the Court at the same time the petition was filed. Further reference to the existing factual situation will reveal that this allegation is not supported. In paragraph 8 of the petition it is asserted that respondents sought to "terrorize and conspire" against petitioners to the end that they were arrested. Such an allegation is without foundation in fact as will be revealed by the evidence.

■ It becomes essential to summarize the factual situation as it is improbable that the entire transcript will ever be reviewed in detail. Irrelevant testimony exists throughout a hearing marked with bitterness between counsel occa-

sioned by counsel for petitioners joining as a party respondent the Regional Counsel for the Immigration and Naturalization Service, one Gilbert Zimmerman. In the answer to the petition the respondent Immigration authorities make the charge that:

"Attorney Jacob L. Morewitz willfully and maliciously obstructed the performance of duty of officers of the Immigration and Naturalization Service in this cause, and acted as an agent herein of the petitioners, seeking to frustrate and impede the lawful execution of the laws of the United States".

The Court declined a motion to strike this averment from the answer, but granted the motion of Mr. Morewitz to be dropped as a party to the proceeding in view of the fact that no affirmative relief was sought against Mr. Morewitz. It is regrettable that the Court does not feel justified in striking the rather unusual averments in the answer, but the contention of Mr. Morewitz that Immigration officials abused their discretion in handling petitioners' requests for hospitalization requires a finding by the Court that such discretion was not abused in this case by reason of the insistence of Attorney Morewitz to the effect that petitioners would not be sent to the hospital for examination and treatment until it suited the convenience of Mr. Morewitz.

As heretofore indicated, the petitioner, Savelis, instituted a proceeding in habeas corpus, declaratory judgment and/or injunction in this Court on November 1, 1955, at a time when he was not actually being detained. At the same time Savelis commenced an admiralty action in this Court, and a proceeding by way of attachment in the state court at Newport News, both seeking the same relief. It appears that Savelis was examined by Dr. E. W. Buckingham on October 22, 1955, and re-examined on November 5, 1955, on which latter date the physician prepared a written report as to his condition. In essence, this report recommends "a few days in the hospital under close observation". The contents of this report were communicated to Immigration Inspector Douglas on or about November 6, 1955, and arrangements were made immediately with counsel for the shipowners to care for the hospitalization of Savelis. For reasons hereinafter noted Savelis did not enter the hospital until November 10, 1955, and then under an order of this Court.

The petitioners, Fragidokis and Theofanou, were examined by Dr. Buckingham on November 8, 1955, and the physician recommended hospitalization "if only for a short period of time". The physician makes the rather remarkable statement concerning the entire crew of the vessel involved in the collision (although he examined only the three petitioners) that "they will *all* show the same definite nervous and shock phenomena". Dr. Buckingham was not called as a witness in the case. Following the Court's order of November 10 sending the three petitioners to the United States Public Health Service Hospital, Fragidokis and Theofanou were ready for release on November 14 but remained in the hospital until November 16, at which time they were presented in court. The Medical Officer testified that he could detect nothing wrong with these petitioners and it is apparent that there is a sharp conflict in findings as related to the report of Dr. Buckingham. As to Savelis, he was retained at the hospital to complete certain tests and was discharged on November 18. No report from the hospital has thus far been presented on Savelis.

On November 8, 1955, petitioners, accompanied by their attorney, applied to Inspector Douglas for a change in status from D–1 to D–2. No written or oral evidence was presented indicating that they, or either of them, had any position offered them, or any immediate prospects of their obtaining any position, on any vessel (other than the Michalakis) and that they felt in need of hospitalization. The requests for change in landing permits were refused without prejudice to their

right to reapply while the vessel was still in port.

■■ The need for hospitalization does not call for a change of status from D–1 to D–2. The authority is granted to the Attorney General (in turn delegated to Immigration) to permit, in his discretion, any alien to be paroled into the United States for "emergent reasons". 8 U.S.C.A. § 1284(a) (2); 8 U.S.C.A. § 1182(d) (5). It is the opinion of this Court that, upon production of a certificate from a reputable physician indicating need for medical treatment and/or hospitalization predicated upon an *actual* examination of the seaman, the Immigration authorities, in the proper exercise of discretion, should give due weight to the opinion of the physician in such cases and, under ordinary circumstances, should grant the parole to the end that immediate medical care may be afforded in the interest of justice. Unfortunately, in this particular case, counsel for petitioners stated in rather emphatic language that the petitioners would not be permitted to go to the hospital until he, the attorney, sanctioned such a move. Repeated efforts on the part of Immigration to ascertain when petitioners would be permitted to go to the hospital brought forth the attorney's answer, "It is none of your d——— business".

■ Faced with this dilemma, what could Immigration do? The petitioners could not be arrested under such circumstances while holding D–1 landing permits. They could hardly have been forcibly taken to the hospital. If, in fact, they were in need of hospitalization, the need was then existing and not at such time in the future as might satisfy the whim of their counsel. If their presence was required for the purpose of signing legal papers, counsel could have readily designated the time when petitioners could have been made available. The interest of the shipowner must likewise be considered. Without knowledge as to whether petitioners will return to the vessel by reason of possible need for hospitalization, the Master would never know when to secure replacements. The petitioners, having stated that they did not intend to return to the vessel and through their counsel having refused to submit to hospitalization, subjected themselves to legal revocation of the D–1 landing permit under the provisions of 8 U.S.C.A. § 1282(b). On November 9, 1955, petitioners were requested to appear at the Immigration office, together with an interpreter. They were individually asked (1) whether they intended to depart from this country on the Michalakis, to which they replied in the negative, and (2) whether they intended to enter the hospital for treatment, to which they replied that they would do so upon receiving instructions from their attorney. In fact the petitioner, Savelis said, "Without my lawyer I won't go anywhere".

Acting upon instructions of the Supervisory Immigration Officer and the Regional Counsel (to whom the Deputy Regional Commissioner had delegated authority to act) Inspector Douglas revoked the D–1 landing permits, took petitioners into custody, and ordered them detained and deported on the Michalakis. The issuance of the order to show cause on the petition for a writ of habeas corpus followed.

■ The duty of the shipowner to provide hospitalization when necessary is fully recognized, but there is similarly a corresponding duty on the seaman to make himself available for such hospitalization within a reasonable time. The advice of his attorney affords no excuse to the application of this rule where treatment is tendered and there appears no valid reason why the seaman should not submit to hospitalization. 79 C.J.S., Seamen, § 181(b), pp. 646, 647.

■ Under the factual situation presented herein the revocation of the D–1 landing permits and the subsequent detention on board the vessel for the purpose of deportation constituted a valid exercise of discretion on the part of Inspector Douglas pursuant to 8 U.S.C.A. § 1282(b). While the vessel has now left the country and the legality of the deten-

tion has become moot by reason of the order of this Court transferring petitioners to the United States Public Health Service Hospital, the writ of habeas corpus would be discharged if the vessel was still in port and petitioners were being detained thereon under orders to deport.

 There remains for consideration the matter of the disposition of these petitioners. In relying upon the advice of counsel they would ordinarily be bound by their acts. The Court is, however, inclined to the belief that as individuals they were ignorant of their rights. It is the opinion of this Court that they should be granted the right of voluntary departure to the same force and effect as though they had been injured in this port and thereafter hospitalized for a period beyond the time fixed for the departure of the vessel on which they arrived in this country. Whether the Court has the right to grant them a reasonable time to secure employment on another vessel shipping foreign is extremely doubtful, but the Court requests the Immigration authorities to consider same in light of the views expressed herein. Since their release from the hospital the petitioners have been paroled in custody of their counsel. They must now be surrendered to Immigration for such further proceedings as may be required.

The writ of habeas corpus is discharged as moot. The relief prayed for in the petition for declaratory judgment is denied. The temporary restraining order is dissolved. Counsel for respondents will prepare and present an order in accordance with this opinion, which is adopted by the Court as its findings of facts and conclusions of law.

### Supplemental Opinion

Following the entry of the Court's final order on November 28, 1955, counsel for petitioners filed a motion to correct the order and enter the same nunc pro tunc. This motion was filed on December 3, 1955, and is made a part of the record.

The attention of the Court was never directed to Rule 49 of the Supreme Court Rules, 28 U.S.C.A., which reads in part as follows:

"1. Pending review of a decision refusing a writ of habeas corpus, or refusing a rule to show cause why the writ should not be granted, the custody of the prisoner shall not be disturbed, except by order of the court wherein the case is then pending, or of a judge or justice thereof, upon a showing that custodial considerations require his removal. In such cases, the order of the court or judge or justice will make appropriate provision for substitution so that the case will not become moot.

"2. Pending review of a decision discharging a writ of habeas corpus after it has been issued, or discharging a rule to show cause why such a writ should not be granted, the prisoner may be remanded to the custody from which he was taken by the writ, or detained in other appropriate custody, or enlarged upon recognizance with surety, as to the court in which the case is pending, or to a judge or justice thereof, may appear fitting in the circumstances of the particular case."

The petition for writ of habeas corpus, application for declaratory judgment and/or injunction, was filed in this Court on November 10, 1955. On the same date the Court entered an order directing that the petitioners be transferred by the respondent, E. Vlachos, Master of the Greek S. S. Michalakis, to the United States Public Health Service Hospital at Norfolk, Virginia, irrespective of any orders previously issued by the Immigration officials. It will be noted that, prior to the entry of the Court's order, the petitioners were being held in custody on board said vessel under orders from the Immigration authorities to detain and deport. It would appear that it would have then been proper for the Court to enter an order in accordance with Rule 49, subd. 1, making appropriate provisions for substitution so that the case would not become moot.

■ Both counsel for the petitioners, counsel for the Master of the vessel, and counsel for the Immigration authorities are desirous of preventing the issue of habeas corpus from becoming moot if such is now possible under the circumstances. While the petitioners were in the United States Public Health Service Hospital, the vessel sailed. Since the Master of the vessel could no longer be considered the custodian of the petitioners, it would have been appropriate to enter an order providing for the substitution of the Immigration officials as parties respondent having actual custody of the petitioners during their stay at the United States Public Health Service Hospital, and thereafter until they shipped foreign on another vessel.

For these reasons an order is this day being entered, nunc pro tunc as of November 10, 1955, making appropriate provision for the substitution of the respondent Immigration officials having custody of said petitioners in order that, if possible, the issue of habeas corpus will not become moot.

■ Counsel for petitioners have likewise filed a motion requesting the Court to contract the transcript of the testimony now being transcribed by the official court reporter to eliminate everything in the transcript except the actual testimony of the witnesses, the rulings of the Court relating thereto and such motions as may have been entertained and acted upon by this Court. It took approximately nineteen hours to hear the testimony and argument of counsel in this case. As significantly pointed out in the opinion of the Court, much of the testimony is entirely irrelevant and the argument of counsel went beyond reasonable limitations. To impose the duty upon the Court to contract the transcript of testimony would probably require as much time as it would to hear the entire case, this due to the fact that there is much bitterness between counsel and it is generally conceded that agreement is impossible. Furthermore, the matter seems to be covered by Rule 9, subd. 2, of the Revised Rules of the United States Court of Appeals for the Fourth Circuit, the pertinent portion of which is as follows:

"If a transcript of the testimony is on file the clerk shall transmit that also; otherwise the appellant shall file with the clerk for transmission such transcript of the testimony as he deems necessary for his appeal subject to the right of an appellee either to file additional portions or to procure an order from the district court requiring the appellant to do so."

Counsel for petitioners have not yet filed the notice of appeal and have made no attempt to designate what part of the transcript of the testimony should be prepared for submission to the Circuit Court of Appeals. At an informal conference on December 12, 1955, the Rule of the Circuit Court of Appeals was directed to the attention of counsel and counsel indicated that this procedure would be followed. For the reasons stated the request of petitioners to require the Court to contract the transcript of testimony is denied.

■ Petitioners have also requested the Court to permit the transcript of testimony as prepared by the official court reporter to be transcribed without the necessity of payment by petitioners or their counsel. No affidavit in forma pauperis in accordance with 28 U.S.C.A. § 1915, has been filed. There has been no showing to the Court that the petitioners are in fact paupers. There has been no showing to the Court of the necessity of any evidence being transcribed for submission to the Circuit Court of Appeals. It is this Court's opinion that the matters involved are those of law and that the facts have been clearly stated in the Court's opinion. In the case of Adamowski v. Bard, 3 Cir., 193 F.2d 578, certiorari denied 343 U.S. 906, 72 S.Ct. 634, 96 L.Ed. 1324, it was held that the provisions with respect to seamen's suits being prosecuted without the prepayment of fees and costs did not apply to "transcript fees". Counsel for petitioners urge that Rule 54, subd. 2, of the Supreme

Court Rules is applicable, but it will be noted that this rule is entirely foreign to the issue involved. Petitioners' request to have the costs of the transcript paid by the United States or anyone other than the petitioners is denied.