# Proposed Interdiction of Haitian Flag Vessels

Proposed executive agreement between the government of Haiti and the United States, by which the U.S. Coast Guard is to stop and board Haitian flag vessels on the high seas in order to prevent Haitians from entering the United States illegally, is authorized both by the U.S. immigration laws, and by the President's inherent constitutional power to protect the Nation and to conduct foreign relations.

Authority for provision in proposed agreement with Haiti, by which the Coast Guard will detain Haitians emigrating in violation of Haitian law and return them to Haiti, derives from the President's statutory power to guard the borders against illegal entry of aliens, and from his inherent constitutional power in the field of foreign relations.

August 11, 1981

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your inquiry concerning the implementation of the proposed interdiction of Haitian flag vessels. As presently formulated, the government of Haiti and the United States will enter into an agreement (the Agreement) permitting the United States Coast Guard to stop Haitian flag vessels, board them and ascertain whether any of the Haitians aboard have left Haiti in violation of its travel laws and whether they intend to travel to the United States in violation of U.S. immigration laws. Individuals who are determined to have left Haiti illegally will be returned to Haiti pursuant to the President's authority in the field of foreign relations in order to assist Haiti in the enforcement of its emigration laws. Those who have left Haiti, whether legally or illegally, in an attempt to enter the United States illegally will be returned to Haiti pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to enforce U.S. immigration laws, to protect our sovereignty, and as an exercise of his power in the field of foreign relations.[1]

The Coast Guard plans to intercept the Haitian vessels in the Windward Passage, on the high seas but relatively close to Haiti.[2] At that

---

[1] We note that the Agreement does not cover United States vessels either while they are in Haitian waters or while they are on the high seas. Therefore, the Agreement does not contemplate the return of the Haitians on board such vessels to Haiti.

[2] Placing the Coast Guard vessels closer to the United States is apparently not possible because of the increased difficulties and costs of detecting and interdicting vessels from Haiti once they have traveled far from Haiti and the practical problems of caring for the Haitians during the 4-day voyage back to Haiti.

point, Haitians will be headed toward either the United States or the Bahamas. Although experience suggests that two-thirds of the vessels are headed toward the United States, it is probable that, as the interdiction continues, an ever-increasing number will claim they are going to the Bahamas. Unless the Haitians admit they are coming to the United States, establishing their intended destination may become more difficult.

1. *Effect of the Immigration and Nationality Act (INA)*. The interdiction will not be affected by the provisions of the INA. Aliens are entitled to exclusion proceedings only when they arrive "by water or by air at any port within the United States." 8 U.S.C. § 1221(a). They are entitled to deportation proceedings only if they are "within the United States." 8 U.S.C. § 1251. Asylum claims may only be filed by those "physically present in the United States or at a land border or port of entry." The Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 105 (to be codified at 8 U.S.C. § 1158(a)). Since the interdiction will be taking place on the high seas, which is not part of the United States, 8 U.S.C. § 1101(a)(38), none of these provisions will apply.

2. *Coast Guard Authority to Enforce United States Laws*. The Coast Guard is authorized to stop ships upon the high seas in order to detect violations of American laws. 14 U.S.C. § 89(a).[3] The interdiction at seas of a foreign flag vessel requires the permission of the flag state, which the contemplated Agreement expressly grants.[4] The authority for returning the Haitians who are attempting to enter the United States illegally may be found in both statutory authority and implied constitutional authority under Article II. The two statutes are 8 U.S.C. §§ 1182(f) and 1185(a)(1). The first, 8 U.S.C. § 1182(f), states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may

---

[3] This section states.

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas . . . for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

[4] The continuing jurisdiction of a country over vessels flying its flag on the high seas is a basic principle of international law. 1 L Oppenheim, International Law § 264 (8th ed. 1955) This principle has been codified in the Convention on the High Seas, Apr. 29, 1958, art. 6, 13 U.S.T. 2313, T.I.A.S No. 5200. Ships flying no flag may also be stopped to determine if they are stateless

by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.[5]

The second, 8 U.S.C. § 1185(a)(1), provides:

(a) Until otherwise ordered by the President or Congress, it shall be unlawful—

(1) for any alien to . . . attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe . . .

Under § 1182(f), the President would make a finding that the entry of all Haitians without proper documentation is detrimental to the interests of the United States and issue a proclamation suspending their entry. It could be argued that the entry of illegal aliens, Haitians or otherwise, is already "suspended" since it is already illegal for them to come, and that the section is directed against those who are otherwise eligible. The section, however, is not limited by its terms to documented aliens, and the legislative history is silent on this point. Since the section delegates to the President the authority to exclude entirely certain classes of aliens, we believe that a return of the Haitians can be based on the Coast Guard's power to enforce federal laws. 14 U.S.C. § 89(a). Likewise, § 1185(a)(1) makes it unlawful for any alien to enter the country unless in compliance with the rules and limitations set by the President. All of the undocumented Haitians who are attempting to enter the country are therefore doing so in violation of this section. *See also* 8 U.S.C. § 1103 (Attorney General's duty to control and guard the borders); *Ex parte Siebold,* 100 U.S. 371, 396 (1879).[6]

Implied constitutional power is less clear. Where Congress has acted, the regulation of immigration is an area in which Congress exercises plenary power. *Kleindienst* v. *Mandel,* 408 U.S. 753, 766 (1972) (power to exclude aliens prevails over First Amendment interests of citizens). There has been recognition, however, that the sovereignty of the Nation, which is the basis of our ability to exclude all aliens, is lodged in both political branches of the government. *See Ekiu* v. *United States,* 142 U.S. 651, 659 (1892). An explicit discussion is found in *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537 (1950). Rejecting a claim that it should review regulations which excluded a German war bride, the Court stated:

---

[5] Neither this Office nor the Immigration and Naturalization Service (INS) is aware of any time when the power granted by this section, added in 1952, has been used

[6] Given the desperate physical condition of many of the Haitians found on the high seas, the Coast Guard may, in particular situations, also be acting pursuant to its duty to render aid to distressed persons and vessels. 14 U.S.C. §§ 2, 88.

244

Petitioner contends that the 1941 Act and the regulations thereunder are void to the extent that they contain unconstitutional delegations of legislative power. But there is no question of inappropriate delegation of legislative power involved here. The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is *inherent in the executive power* to control the foreign affairs of the nation. *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304; *Fong Yue Ting* v. *United States,* 149 U.S. 698, 713. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

*Id.* at 542 (citations omitted, emphasis added). *See also Savelis* v. *Vlachos,* 137 F. Supp. 389, 395 (E.D. Va. 1955) *aff'd,* 248 F.2d 729 (4th Cir. 1957) (dictum).

The President, in the exercise of this inherent authority, would be acting to protect the United States from massive illegal immigration. His power to protect the Nation or American citizens or property that are threatened, even where there is no express statute for him to execute, was recognized in *In re Neagle,* 135 U.S. 1, 63–67 (1890). *See also In re Debs,* 158 U.S. 564, 581 (1895); *United States ex rel. Martinez-Angosto* v. *Mason,* 344 F.2d 673, 688 (2d Cir. 1965) (Friendly, J. concurring); 50 U.S.C. § 1541 (War Powers Resolution).[7] A recent Supreme Court decision points out that, in the absence of legislation, it was a common perception that the President could control the issuance of passports to citizens, citing the foreign relations power. *Haig* v. *Agee,* 453 U.S. 281, 292–94 (1981).

The President may also act to return the boats with the flag state's permission as an exercise of his power in the field of foreign relations, a field in which "with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304, 319 (1936). *See also Narenji* v. *Civiletti,* 617 F.2d 745, 747–48 (D.C. Cir. 1979), *cert denied,* 446 U.S. 957 (1980) (regulation of Iranian students); *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.,* 333 U.S. 103 (1948) (regulation of foreign airlines). The President's power is strongest where he has well recognized constitutional powers (foreign affairs) to which Congress has added statutory delegation (8 U.S.C. §§ 1182 (f), 1185).

---

[7] This Office has relied upon such inherent authority in an opinion, stating that the President could act to prevent airplane hijackings by placing marshals on board, even in the absence of express authority to take such preventive measures Memorandum for the Director, United States Marshals Service, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, 2-3 (Sept 30, 1970).

3. *Coast Guard Authority to Enforce Haitian Law Pursuant to an Agreement Entered into by the Executive.* The Coast Guard has submitted a draft Agreement that would permit the Coast Guard to board Haitian vessels in order to determine whether any alien is committing an offense against Haitian emigration laws. The issue which arises is whether the Executive can enter into an agreement under which the United States agrees to detain Haitians who are emigrating in violation of Haitian law in order to return them to Haiti. The President's authority to enter into executive agreements with foreign nations may be exercised either under congressional authorization or the President's inherent authority.[8] The President's power to enter into such agreements on his own authority can arise from "that control of foreign relations which the Constitution vests in the President as a part of the Executive function," 39 Op. Att'y Gen. 484, 486 (1940).[9] The limits on presidential power to enter into these agreements are not settled and have aroused controversy from the earliest days of our Republic.[10]

We believe that authority to enter into the Agreement is provided by two sources—the power delegated by Congress to the President, through the Attorney General, to guard the borders, 8 U.S.C. § 1103(a), and the President's authority in the field of foreign relations. The arrest of Haitian citizens as an aid to Haiti's enforcement of its emigration laws will enable the President to curtail the flow of Haitians in the furtherance of his "power and duty to control and guard the boundaries and the borders of the United States against the illegal entry of aliens." *Id.* The breadth of the President's authority in the field of foreign relations is extremely broad, as illustrated by the numerous executive agreements that have been negotiated and upheld by the courts.[11] *See United States* v. *Pink,* 315 U.S. 203 (1942) (Litvinov Agreement); *United States* v. *Belmont,* 301 U.S. 324 (1937) (same); *Tucker* v. *Alexandroff,* 183 U.S. 424, 435 (1902) (Mexican/United States agreement to permit both countries to cross the border in pursuit of marauding Indians);[12] *Dole* v. *Carter,* 444 F. Supp. 1065, 1068-69 (D. Kansas), *motion denied,* 569 F.2d 1109 (10th Cir. 1977) (return of the Crown of St. Stephen).

An agreement to aid the enforcement of the laws of another country is not without precedent. In 1891, the United States and Great Britain entered into an executive agreement prohibiting for one year the killing of seals in the Bering Sea. *Modus Vivendi Respecting the Fur-Seal Fisheries in Behring Sea,* 1 W. Malloy, Treaties, Conventions, International

---

[8] E. Corwin, The President's Control of Foreign Relations 116–17 (1917) (Corwin).

[9] Agreements executed by various Presidents for the settlement of claims of United States citizens against foreign governments are examples. *See Dames & Moore* v. *Regan,* 453 U.S. 654 (1981).

[10] E. Corwin, The President, 216–233 (3d ed. 1948) (debate between Hamilton and Madison over the constitutionality of Washington's Proclamation of Neutrality); L. Henkin, Foreign Affairs and the Constitution 177 (1972) (Henkin).

[11] Henkin, *supra,* at 179.

[12] 1 W. Malloy, Treaties, Conventions, International Acts, Protocols, and Agreements 1144 (1910) (Malloy).

Acts, Protocols, and Agreements, 743 (1910) (Malloy). This agreement permitted the seizure of offending vessels and persons if "outside the ordinary territorial limits of the United States," by the naval authorities of either country. *Id.,* Art. III. "They shall be handed over as soon as practicable to the authorities of the nation to which they respectively belong. . . ." *Id.* As there was no statutory authority for this agreement, the President acted pursuant to his inherent authority in the field of foreign affairs.

Between 1905 and 1911, Presidents Roosevelt and Taft entered into a series of executive agreements that permitted the United States to operate the customs administration of both Santo Domingo (now the Dominican Republic) and Liberia.[13]

> [This first agreement] provided, in brief, for (1) a receiver of 'the revenues of all the customs houses,' to be designated by the President of the United States and satisfactory to the Dominican President; (2) the deposit in a New York bank for the benefit of creditors of all receipts above 45 percent, which was to be turned over to the Dominican Republic for the expenses of government administration and the necessary expenses of collection; and (3) the eventual distribution of the funds in the payment of Dominican debts.

W. McClure, International Executive Agreements 94 (1941). A customs administration in Haiti was established by treaty in 1915 but an elaborate series of executive agreements were signed "both extending and terminating various phases of American intervention and assistance in the financial, medical and military affairs of Haiti." [14]

Many authorities have noted that a President's exercise of his authority in this area is "a problem of practical statemanship rather than of Constitutional Law." E. Corwin, The President's Control of Foreign Relations 120-21 (1917).[15] The Supreme Court has upheld a variety of executive agreements based upon a number of theories and it is difficult to delineate with certainty the limits of the President's authority when he enters into such agreements based solely on his inherent executive authority. *But see Reid* v. *Covert,* 354 U.S. 1, 16-19 (1957) (agreement cannot deny civilian his right to a trial by jury). Because this Agree-

---

[13] 1 W. Malloy, *supra,* at 418. *See also* McDougal & Lans, *Treaties and Congressional-Executive or Presidential Agreements,* 54 Yale L.J. 181, 279 (1945); N. Small, Some Presidential Interpretations of the Presidency, 78-79 (1970) The arrangement was based on a fear that these countries' debts would be used by European countries as a grounds for military intervention.

[14] McDougal, *supra,* 54 Yale L.J. at 279. The final one was signed in 1934

[15] Commitment of financial resources overseas "depend[s] directly and immediately on appropriations from Congress. . . . While the issue of Presidential power to make executive agreements or commitments has no legal solution, political forces have mitigated its theoretical rigors. The President has to get along with Congress and with the Senate in particular, and he will not lightly risk antagonizing it by disregarding what it believes are its constitutional prerogatives." Henkin, *supra,* at 183-84. *See also* K. Holloway, Modern Trends in Treaty Law 216-17 (1967), McClure, *supra,* at 330; Restatement (Second) of the Foreign Relations Law of the United States § 121 (1965)

ment will be based both on delegated and inherent authority, we believe that it is constitutional.

4. *Obligations Under the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, United Nations, Protocol, 19 U.S.T. 6223, T.I.A.S. No. 6577.* Article 33 (19 U.S.T. 6276) of the Protocol, to which the United States is a party, provides that "No Contracting State shall . . . return (*"refouler"*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Individuals who claim that they will be persecuted for one of these reasons must be given an opportunity to substantiate their claims. The Protocol does not, however, mandate any particular kind of procedure. We have reviewed the plan outlined in the draft prepared by INS and believe that it comports with the Protocol.

5. *Effect of the Foreign Assistance Act of 1961, 22 U.S.C. § 2151–2151d (Supp. III 1979).* We know of no provision of the Act that would prohibit the interdiction, since no foreign aid funds are being used.

6. *Formal Implementation of the Interdiction.* There are three formal steps still to be taken before the interdiction can begin. The first is clearance of the Agreement by the Department of State. The second is the signing of the Agreement by the United States and the government of Haiti.[16] The third is the issuance of a proclamation by the President pursuant to 8 U.S.C § 1182(f). The proclamation would contain a finding that the entry of Haitian nationals who do not possess proper documentation for entry into the United States is detrimental to the interests of the United States. The proclamation would then suspend the entry of all such Haitian nationals. If a decision is made not to rely upon 8 U.S.C. § 1182(f), no proclamation is necessary. However, the validity of the President's action will certainly be strengthened by relying on both statutory provisions which provide support for the contemplated action.

The Coast Guard is presently under the authority of the Department of Transportation. 14 U.S.C. § 1. The Attorney General is in charge of enforcing the immigration laws. 8 U.S.C. § 1103. The Coast Guard will be enforcing both the immigration laws and the laws of Haiti pursuant to the Agreement. While a memorandum of understanding signed by the Coast Guard, INS, and the Department of State would facilitate operations, 14 U.S.C. § 141, a presidential order to the Secretary of Transportation to have the Coast Guard act to enforce both parts of the Agreement will avoid any question about the Coast Guard's authority to act.

---

[16] The Agreement should be transmitted to Congress within 60 days. 1 U S.C. § 112b(a) (Supp. III 1979).

7. *Coast Guard's Authority to Operate in Haitian Waters:* Under the Agreement Haiti will grant the Coast Guard permission to enter its waters to return Haitian nationals. The Coast Guard's authority to enter the waters will be pursuant to the Agreement.[17] By permitting the Coast Guard to enter its waters, Haiti is granting free passage to our ships and crews. Sovereign nations often grant permission for the passage of foreign forces. *Tucker* v. *Alexandroff,* 183 U.S. 424, 435 (1902); *Schooner Exchange* v. *McFaddon,* 11 U.S. 116, 139–40 (1812); 2 J. Moore, A Digest of International Law § 213 (1906). We suggest a modification to the Agreement to make it clear that Haiti will not exercise jurisdiction over the Coast Guard ships or her crews while they are in Haitian waters. *Schooner Exchange,* 11 U.S. at 140, 143.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[17] It will not be pursuant to 14 U.S.C. § 89(a) because the waters of Haiti are not within the jurisdiction of the United States. *United States* v. *Conroy,* 589 F.2d 1258, 1265 (5th Cir. 1979) Section 89(a), however, does not limit the authority of the Coast Guard to act pursuant to another provision of law—in this case, the Agreement. 14 U.S.C. § 89(c).