Ex parte KURTH et al.

District Court, S. D. California, Central Division.

June 29, 1939.

Appeal Dismissed Oct. 2, 1939.

A. L. Wirin and Maurice Saeta, both of Los Angeles, Cal., for petitioners.

Ben Harrison, U. S. Atty., and Ralph E. Lazarus, Asst. U. S. Atty., both of Los Angeles, Cal., for the United States.

YANKWICH, District Judge.

The petitioners seek to stay an order of deportation. Their petition for a writ of habeas corpus, in its amended form, nowhere asserts their right to be in the United States.

It merely alleges, in a general way, that the petitioners are imprisoned and confined and restrained of their liberty by Honorable Albert Del Guercio, United States Immigrant Inspector and Law Officer attached to the Immigration and Naturalization Service of the United States Department of Labor at Los Angeles, California; that said imprisonment, detention, confinement, and restraint are illegal; and that the illegality thereof consists in the following: "That said petitioners are being imprisoned under and by virtue of a purported order of deportation to Germany, which said order is now void and of no force and effect in the following respects and particulars."

The allegations which follow are to the effect that the petitioners are refugees, and that, as a matter of fact, such an order would subject them to punishment and deny the constitutional right of freedom of asylum of political refugees and due process of law.

Then follow allegations relating to alleged acts said to have been committed prior to the hearing upon which the deportation warrant was based, and which, in a general way, charge arbitrariness on the part of Albert Del Guercio and conspiracy to cause the men to be returned to Germany.

As stated, nowhere in the petition is it averred that these aliens are legally in the United States. And it is significant that in the brief filed by Mr. Sol M. Alpher with the Department of Labor, while the order of the Board was before them, no such contention was made. On the contrary, it is stated therein: "Hans Kurth and Gunther Haberman, natives and citizens of Germany, joined the crew of the M. S. Seattle in Germany, as assistant electrician and as apprentice seaman, respectively. Both aliens are opposed to the present German Government, and had engaged in anti-government political activities in Germany prior to their sailing. Because of their opinions and activities, the aliens found it necessary for their physical safety to leave Germany and seek asylum elsewhere. *They, therefore,*

*became seamen and shipped on the Seattle, arriving in San Francisco on September 3, 1938. Here they deserted; eight days later they were arrested in Santa Barbara, California, on charges of vagrancy. Examination and hearings by Immigrant Inspectors followed shortly thereupon, resulting in the present proceedings."* (Italics added)

Nor was it claimed that, by reason of the law which gives seamen the right to a temporary stay in the United States, or by reason of any visa issued, they had the right to remain in the United States. All that the brief asked was that the issuance of warrants of deportation be withheld pending the voluntary departure of the aliens from the United States to any other country without expense to the United States.

 If we are going to be realistic, I think we ought to "get down to brass tacks" and realize just what these aliens are claiming. When no claim of citizenship is made, the burden of proving the right to remain in the United States is placed by the law upon the alien. See 8 U.S.C.A. § 221. This burden must be assumed by an alien seaman claiming this right. Taranto v. Haff, 9 Cir. 1937, 88 F.2d 85. The alienage of the petitioners here is established by all the evidence in the record and by their own admissions. More, their petition here is based upon the proposition, as is also the argument of their counsel, that they should be granted admission as political refugees from an alien country.

 Let us advert, for a moment, to the rights of an alien who is in the United States, and whose right to be here is challenged. It is made the duty of immigration officers, when informed of the presence of an alien in the United States, to examine him as to his right to be here. The Ninth Circuit, in Graham v. United States, 9 Cir. 1938, 99 F.2d 746, has sustained the right to make such examination.

If we eliminate entirely from consideration the questions asked of these two aliens before the present hearings, which were followed by a recommendation for deportation, and which were adopted by the Assistant Secretary of Labor, we find that, at these hearings, which were held in their presence and the presence of their counsel, the alienage of both petitioners appeared. I quote from the record:

"Q. Mr. Kurth, in order to clear up a matter in the record, I would like to ask you a few questions. You first arrived in the United States at the Port of San Diego, California. A. Yes.

"Q. On the M. S. 'Seattle'? A. Yes.

"Q. And according to the record, you arrived at that port on that vessel August 25, 1938, is that correct? A. I can't say that date exactly.

"Q. And the vessel then proceeded coastwise from San Diego to San Francisco, where you deserted the vessel? A. Yes, the ship went to Canada.

"Q. It went to Canada after leaving San Diego? A. San Francisco and Vancouver.

"Q. Well, now, here, after leaving San Diego, the vessel proceeded directly to San Francisco? A. Yes.

"Q. *At the time of your arrival at San Diego on this vessel, did you have an unexpired immigration visa, issued by an American Consul?* A. No.

"Q. *Was it your intention at the time of your arrival at San Diego to remain permanently in the United States?* A. Yes." (Italics added)

At other places in the proceedings, similar statements were made. And, at no time, was it claimed that, by virtue of any statute of the United States, these persons had a right to enter the United States for residence therein. On the contrary, it was stated frankly that they shipped as seamen from Germany and came to the United States as such, then deserted.

Seamen are not "immigrants". 8 U.S. C.A. §§ 202, 166, 167.

 Now, what are the rights of an alien who is apprehended in the United States, and whose right to be here is challenged? Before being deported, and while he is held for deportation under a warrant of arrest, he is entitled to a fair hearing. That means just this: The right to be apprised of the nature of the charge against him, the reason for the challenge of his right to be here; to be confronted with witnesses, and to present testimony and to have counsel. See Branch v. Cahill, 9 Cir. 1937, 88 F.2d 545, 546; Ex parte Nunez, 9 Cir.1937, 93 F. 2d 41; Hays v. Zahariades, 8 Cir.1937, 90 F.2d 3; U. S. ex rel. Vajtauer v. Commissioner of Immigration, 1927, 273 U. S. 103, 47 S.Ct. 302, 71 L.Ed. 560; U. S. ex rel. Tisi v. Todd, 1924, 264 U.S. 131, 44 S.Ct. 260, 68 L.Ed. 590. None of these rights has been denied these aliens in the

hearings which preceded the recommendation for the order of deportation.

There appears to have been some questioning of the aliens prior to the formal hearing. To this questioning, so far as the record shows, the aliens made free answers. All the preliminary questions related to their arrival into the United States. No admissions were sought or obtained, other than those which were made subsequently, and which are made the basis of these proceedings. No passports were unlawfully taken from their persons and used against the aliens in the deportation. That is the difference between this case and the cases to which counsel refer. See In re Sugano, D. C.Cal.1930, 40 F.2d 961; Ex parte Eguchi, D.C.Cal.1932, 58 F.2d 417; Roux v. Commissioner, 9 Cir.1913, 203 F. 413; U. S. ex rel. Bosny v. Williams, D.C.N.Y.1911, 185 F. 598. In those cases, admissions were secured by unfair tactics on the part of the officers,—admissions which might not otherwise have been given.

But here, *the alienage is not disputed.*

There is no assertion of the right to be in the United States except as refugees. Throughout these proceedings, these men truthfully said that they deserted their ship. And under examination by their counsel before the Board of Inquiry, their political activities in Germany and their birth and residence there were fully gone into as a basis for the plea there made, not that they had the right to be in the United States or to remain after entry as alien seamen, but in order to lay a foundation for the claim of "the right to asylum".

Before discussing this claimed "right of asylum", I quote from an article of mine which expresses my view, at the present time, as to the standard of conduct of those charged with the enforcement of law. Yankwich, Lawless Enforcement of Law, 9 Southern California Law Review, 1935, 14, 32-33.

"The strength of our legal system lies in the fact that it is based upon the rule of law. It has been said that the chief aim of the modern State is to 'uphold the rule of law'. (MacIvor, The Modern State, 478.) We who are charged with the administration of justice must uphold the rule of law. It will not do to say that the persons against whom these practices are used are anti-social— persons who violate the law. The very test of our rule of law lies in its application to those who come in conflict with the law. If we deny its application to them, it ceases to exist for any of us. In giving them the full benefit thereof, we do it, not for them, but for ourselves.

" 'Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine, this court should resolutely set its face.' (Brandeis, J. dissenting in Olmstead v. U. S., 1928, [277 U.S.] 438, 485 [48 S.Ct. 564, 575, 72 L.Ed. 944, 66 A. L.R. 376].

"In these days, when we hear so many complaints about disrespect for law, it is sound social policy to heed the warning of those who, like Mr. Justice Brandeis, feel that nothing encourages such disrespect, as the lawless acts of the guardians of the law —those charged with its enforcement.

"And it is also good ethics to demand in those charged with law enforcement civilized behavior. A different conduct, based upon the plea of justifiable ends, leads us right into Machiavelli's amoral maxim: 'Right and wrong have nothing to do with government' ".

That has been, and is, my attitude towards the rights of persons who come in conflict with the law. But to find violations of constitutional rights, to find violations of the rule of fairness, there must be acts which result in securing advantages from the petitioners or admissions, which, otherwise, would not have been made.

Attached to the answer is a warrant issued by an officer of the United States, Mr. Turner W. Battle, Assistant to the Secretary of Labor, which recites, after the title, "Warrant—Deportation of Alien. United

262

States of America, Department of Labor, Washington.

"To: District Director of Immigration and Naturalization, Los Angeles, Calif.,

"District Director of Immigration and Naturalization, San Antonio, Texas,

"Or to any Officer or Employee of the United States Immigration and Naturalization Service.

"Whereas, from proofs as submitted to me, Assistant to the Secretary, after due hearing before an authorized Immigrant Inspector, I have become satisfied that the aliens Hans Kurth and Gunther Haberman, who entered the United States at San Diego, Calif., ex MS 'Seattle', on or about the 24th day of August, 1938, are subject to deportation under Section 19 of the Immigration Act of February 5, 1917 [8 U.S.C.A. § 155], being subject thereto under the following provisions of the laws of the United States, to-wit: The Acts of 1924 [8 U.S.C. A. § 201 et seq.], in that at the time of their entry they were not in possession of unexpired immigration visas:

"I, the undersigned officer of the United States, by virtue of the power and authority vested in me by and under the laws of the United States, do hereby command you deport the said aliens to Germany, at the expense of the steamship company importing them".

Then follow provisions for their expenses, and the alternative that they may be permitted to "depart or ship foreign one way, without expense to the United States, to any country of their choice, except contiguous territory or adjacent islands, upon consent of sureties, such departure to be verified and considered a satisfactory compliance with the terms of the warrant, but aliens should be advised that they will not, under existing law, be eligible to apply for entry to the United States until after one year following date of deportation, and then only if the Secretary of Labor has authorized them to apply for admission". Then follows the formal jurat.

There was offered on behalf of the Government a certified copy of the proceedings had from the beginning to the end. This included everything said on behalf of the aliens, even appeals made by prominent persons, asking leniency or special consideration for them. The record contains a complete transcript of the testimony had at the hearing, which resulted in the recommendation for deportation. This testimony, which I have already analyzed, shows distinctly, as do the admissions in the brief and in this very petition, that these aliens have *no right to be in the United States*.

We cannot brush aside the finding of the Secretary, who, under the seal of the United States, says that his conclusion stems: *"From evidence laid before me,"* upon an allegation of counsel, *on information and belief,* that they believe he didn't read the record? To do so would deprive the lawful acts of executive heads of departments of the United States of that presumption of legality which the law gives to them.

Of course, if we find any unfairness in the proceedings, or if we find that there has been denial of any of the rights to present testimony or in other respects, unfairness may be said to exist. But nothing of this character appears in this record.

The sole ground for deportation is that these persons do not have an immigration visa, and are illegally in the United States. They admit that they do not have a visa. They admitted the fact at the hearing before the Board, at which they were represented by counsel. It is not denied anywhere in these proceedings. Nor was it made the basis of the plea before the Secretary. In the face of this showing, to yield to any generous feeling toward them would be to indulge in a violation of the duty, binding upon me, that I follow the law. As a Judge of the United States, I am not like the oriental cadhi, who is bound by no restriction, and decides according to what may be his whim of the moment. Justice of this type, conformable to rudimentary civilizations does not comport with the doctrine of the supremacy of the law, whereby the hand of him who executes the law, and the hand of him who interprets the law, are bound equally by fundamental legal rules. This is our only protection against arbitrariness and stands between free government and autocracy. More, means are given to prevent the exercise of arbitrary power. (See my "Constitution and The Future," 1938)

A judge who, motivated by some generous impulse toward people who claim asylum here, should find unfairness in proceedings of this character, in which deportation is sought upon one ground only, namely, that *the petitioners are aliens and have no right to remain in the United States,* and no contrary right is established, would be doing violence to the rule of law. Unless, of course, as it is contended, I am bound

by "the right of asylum" to allow the petitioners to remain in the United States.

On that subject, the question with which we are confronted is not one of policy, but of law. Historically, the United States, despite expressions to the contrary of leaders like Jefferson, and anti-alien movements preceding the Civil War, has followed the policy of unrestricted admission for anyone who sought its shores. Under this policy, which continued until the beginning of 1921, it granted asylum to those who were fleeing from religious and political persecution, provided they were eligible otherwise. From these groups come men like Carl Schurz and others, who, after fleeing their native country for participation in outlawed political movements, sought refuge in the United States. They made distinct contributions to the life of the United States. Restrictions directed at special groups began immediately after the Civil War. The first forbade American vessels to transport Chinese. The Chinese were excluded in 1882, convicts and prostitutes in 1875, mentally defectives and those likely to become public charges in 1882, contract laborers in 1885, polygamists in 1891, anarchists in 1903, illiterates in 1917. After the World War, the Congress adopted the present general restrictive immigration policy by limiting strictly the number of those entering the United States and establishing the quota system for the various nationals who may enter. 8 U.S.C.A. §§ 101–230. And see Immigration, in Encyclopedia of the Social Sciences, 1937, Vol. 7, pp. 587, 592–594. Presidents like Taft and Wilson protested against the restrictive immigration policy because it went counter to the policy which made this country the refuge of the oppressed, whether on religious, political or other grounds. But, in spite of this, the Congress adopted it. And aliens who enter the United States must do so in accordance with the present provisions for such entry.

The restrictive immigration statute does not except political refugees from its terms. There is nothing which gives an alien the right to insist that he be admitted to the United States because he may be a refugee from some autocratic government or a government the policies of which are contrary to the policies of the United States Government.

To say that once the alien has landed he can claim the right to remain is to grant him a right against the United States which *he does not have.* The United States, in its sovereign capacity, has the right to say who shall be admitted to its borders or remain therein and who shall be refused admission. See United States v. New York Steamship Co., 1925, 269 U.S. 304, 313, 46 S.Ct. 114, 70 L.Ed. 281; Navigazione Libera Triestina v. United States, 9 Cir.1929, 36 F.2d 631; United States ex rel. Volpe v. Smith, 1933, 289 U.S. 422, 423, 53 S.Ct. 665, 77 L.Ed. 1298. No law of the United States allows the assertion by an alien of a right against its sovereignty unless the right appears clearly somewhere in the law.

The argument of counsel that the Ninth Amendment, U.S.C.A.Const., gives the right of asylum does not impress me by its soundness. The claim is contrary to the principles of international law and has never been recognized by any civilized nation.

The restrictive immigration law of the United States has been attacked at all times. The attack began when we began to exclude persons who believed in polygamy, and those professing anarchy. The answer of the Supreme Court has been that a sovereign nation has the right to choose whom it shall receive. See United States ex rel. Turner v. Williams, 1904, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979; Nicoli v. Briggs, 10 Cir.1936, 83 F.2d 375. As already stated, those fleeing from persecution have made valuable contributions to our national life, and perhaps those who will follow us, say in 2039, may look back and say that it was not a good policy to prevent accretion to this country of some of the alien groups who find themselves at war with certain foreign political thinking, and that perhaps it would have been better if we had continued the historical policy of asylum under which we received so many valuable elements who helped develop the country. But the Congress of the United States has chosen a different policy. They have declared the conditions upon which a person shall enter the United States. And they do not make any distinctions between a person who is and one who is not a political refugee. 8 U.S.C.A. §§ 106, 136, 202. There is nothing in the Constitution or the laws of the United States which confers any special right upon any alien within the United States. If he comes here legally, he is entitled to equal protection of the law. Yick Wo v. Hopkins, 1886, 118 U. S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

This idea is the outgrowth of an old religious ideal, which came into being with the Mosaic law, and has been adopted as

part of the law of every civilized country, namely, equality of treatment of all who reside legally in a territory. This principle was unknown to Roman and Babylonian law. [Deuteronomy 1:16–17; 16:18–20; Leviticus 19:15; and see Galatians 3:38; The Acts 22:24–29; Radin on Roman Law, 1927, pp. 105-106; Yankwich: The Cultural Background and Some of the Social Phases of the Code of Hammurabi, 1930, 4 Southern California Law Review, 20; J. M. Powis Smith, The Origin and History of Hebrew Law, p. 279.] Every civilized nation with a social order based upon law, and not upon whim or caprice, has embodied this principle into its legal structure. But there is no principle of either national or international law which declares that an alien who is outside of a nation's territory has a right to choose the country where he shall go.

We know, as a matter of fact, that England was very liberal to those who sought refuge after the fall of the Second French Republic and the establishment of the short-lived Empire of Louis Napoleon. Yet England feared and opposed those who inspired the French Revolution. Witness the speeches of Burke and others in the Parliament of the day. France has been, perhaps, as tolerant as any nation in Europe. Yet they have repeatedly denied asylum to those fleeing from other countries. So that, while the history of this country and the history of the world shows a tolerance for those who flee from persecution and who are guilty of only what Europeans call "political crimes", the fact remains that this is not our present policy. The Constitution of the United States is not a statute. It does not confer any rights except in the instances where those rights are specifically enumerated. If the contention here made be true, then every refugee from any country in Europe who can show that he is seeking to escape, not because of any immorality or illegal act on his part, but because he professes a political doctrine which is heterodox in his country, could demand the right to be admitted into the United States. Before me is not the question of interpreting a law liberally. I am asked to turn what has been a policy into a positive right. Asylum has never been a right. It has never been recognized as such. Every country in Europe and both Americas declined and do decline now, as *the United States does*, to receive persons promiscuously. See Fau-

chille: Traité de droit international public, 8 ème ed., 1922, Vol. 1, secs. 441-442(16) pp. 888–945; Hall, International Law, 7th Ed. Secs. 13, 63; Moore, Digest, Vol. IV, pp. 67 et seq., 151 et seq.; Oppenheim, International Law, Vol. 1, sec. 314; Phillimore, Commentaries upon International Law, Vol. 1 p. 321; Wilson, International Law, pp. 138-139.

There is no substantial legal basis for the argument that an alien, who comes into the United States by deserting a ship, —as it is admitted these aliens did,—and who does not have the right to enter and to remain in the United States, by saying, "I am a political refugee from Germany; I am being persecuted for my political ideals; I ask the freedom of this country, a country in which my ideals are not persecuted, because they are democratic and conform to constitutional government", may remain.

Generous though I feel towards the oppressed, I cannot declare a right which the Congress has denied. Even assuming that prior to the enactment of the restrictive immigration statute the right existed, its enactment abolished it. And I cannot read into it an exception in favor of political refugees.

The Department of Labor may prescribe the conditions under which the alien may depart. In the instant case, the petitioners have been given the right to depart voluntarily within a certain time. And I cannot extend this right. The Department of Labor has the sole power so to do.

I find, therefore, that the defendants are illegally in the United States and have remained therein illegally; that a hearing was accorded to them, after their arrest upon a lawful warrant of arrest; that, at that hearing, they were represented by counsel, they gave testimony, and that the hearing was in all respects fair, and that the warrant of deportation, issued by the Assistant to the Secretary of Labor on the 12th day of January, 1939, upon the recommendation of the Inspectors who held the hearing, is, in all respects, a lawful and legal warrant of the United States, and that the detention of the petitioners by the Immigration Director under it is in all respects legal. The writ of habeas corpus heretofore issued will therefore be discharged, and the petitioners will be remanded to the custody of the Immigration officials, under the warrant.