UNITED STATES of America ex rel. Julius SZLAJMER, Relator,

v.

P. A. ESPERDY, District Director of Immigration, Port of New York, and Captain Loroch, Captain of THE M. S. OLESNICA, Respondents.

United States District Court
S. D. New York.
Oct. 26, 1960.

S. Hazard Gillespie, Jr., U. S. Atty., New York City, for respondent Esperdy (Roy Babitt, Sp. Asst. U. S. Atty., New York City, of counsel).

Wolf, Popper, Ross, Wolf & Jones, New York City, for Captain Loroch of the S. S. Olesnica (Paul L. Ross, New York City, of counsel).

Bella V. Dodd, New York City, for petitioner. American Civil Liberties Union, amicus curiae (Edith Lowenstein, New York City, of counsel).

MacMAHON, District Judge.

This is a petition for a writ of habeas corpus by an alien crewman challenging his detention by the Master of a Polish ship under an order of the Immigration and Naturalization Service. The order summarily revoked relator's landing permit and remanded him to the Master for deportation without a hearing despite his plea for political asylum. The case raises questions of first impression regarding the rights of alien crewmen under § 243 (h) of the Immigration and Nationality Act, 8 U.S.C.A. § 1253(h). That statute provides that "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason." The statute has been implemented by regulations setting forth hearing procedures available to aliens requesting a stay of deportation predicated upon a claim by the alien that he would be subject to physical persecution if deported to the country designated by the Immigration Service (8 C.F.R. § 243.3(b)).

Claiming to be an alien "within the United States" by reason of his presence in this country under a crewman's landing permit, relator asserts that he is eligible to receive the benefits of § 243 (h). Asserting that relator is either a mala fide crewman or a deserter from a ship still in port, the Immigration Service contends that the statute is not applicable to relator. The argument is that as a mala fide crewman, relator, in legal effect, is an excluded alien and, therefore, not within the United States, or as a deserter from a ship still in port, he is subject to summary deportation under § 252 (b) of the Immigration and Nationality Act (8 U.S.C.A. § 1282(b)) and its implemental regulations (8 C.F.R. § 252.2).

The question, therefore, is whether an alien crewman, who is ashore in the United States under a crewman's landing permit which has not expired, is entitled to a hearing under § 243(h) and 8 C.F.R. § 243.3(b) on his claim that he will be subject to physical persecution if deported to his country on the ship which brought him. After argument and study of the case, I held that relator is entitled to a hearing. Accordingly, I sustained the writ, with opinion to follow, and released relator in his own recognizance pending the determination of a hearing.

The facts are not in dispute. Relator, a citizen and national of Poland, arrived at the Port of New York on June 11, 1960 as a member of the crew of the Polish motor vessel Olesnica, one of three Polish ships plying western ports. He applied for shore leave and after a routine examination by an Immigration Inspector, which revealed no disqualifications, received a conditional (D–1) landing permit admitting him to the United States as a bona fide crewman temporarily here with the intention of departing within twenty-nine days on the same vessel. 8 U.S.C.A. §§ 1101(a) (15) (D) and 1282(a) (1); 8 C.F.R. § 252.1(d) (1). Such conditions are set forth on the

face of relator's application [1] and on the permit itself.[2]

Relator went ashore and on the night of June 14, 1960, when his ship sailed coastwise for Philadelphia, he did not report on board but appeared at the New York office of the Federal Bureau of Investigation seeking political asylum and groping for help. The Bureau referred him to the Immigration and Naturalization Service, and the next morning advised the Immigration Service of his visit and request for asylum. During the day, the Master reported his desertion and early that evening relator's attorney arranged a conference with the Immigration Service for the next afternoon regarding an application for asylum under § 243(h).

Relator and his attorney appeared at the office of an Immigration Inspector at the appointed time on June 17. The Immigration Service concedes that relator was not accorded a hearing. Instead, he was promptly warned that his statements could be used against him, put under oath, and interrogated extensively through an interpreter respecting his intentions as a bona fide crewman and his good faith in seeking asylum.

Regarding his intentions as a bona fide crewman, relator admitted that he had wanted to leave Poland for a long time but maintained that he did not form an intention to defect until after he came to the United States and saw New York. After he arrived here, he decided to stay for he "hoped to be able to get some political rights here like so many other Polish seamen who deserted and finally got the right to remain permanently in

the United States." Respecting his claim that he would be subject to physical persecution if returned to Poland, he admitted that he had been a member of the Communist Party, said that he had become disillusioned, and claimed that it would amount to a "rub out" if he were sent back to Poland.

After this all-day conference, the Immigration Service, acting on relator's avowed hope to remain here under asylum and his failure to report on board his ship, found that relator did not intend to depart on the ship which brought him, revoked his landing permit, remanded him to the Master of the Olesnica, and summarily ordered his deportation. A writ of habeas corpus was obtained and the Master, in obedience to its command, produced relator on the return day, and he was held in the custody of the Immigration and Naturalization Service under a stipulation maintaining the status quo pending the court's decision.

There is nothing in the text, history or purpose of § 243(h) which excludes alien crewmen from its benefactions. The statute explicitly applies to "any alien within the United States". The term "alien" means any person not a citizen or national of the United States. 8 U.S.C.A. § 1101(a) (3). Obviously, therefore, "any alien" includes a foreign crewman. Philippides v. Day, 1930, 283 U.S. 48, 50, 51 S.Ct. 358, 359, 75 L. Ed. 833. Nor is there any mystery in the phrase "within the United States". Relator urges that his mere physical presence within our borders entitles him to the shelter of the statute. Mere physical presence, however, is not enough to

1. "I hereby apply for a crewman landing permit (Form 1–184) to facilitate my entry into the United States as a crewman: I understand that I will be permitted to remain in the United States only while the vessel on which I arrived is in port: that I will not be permitted to work ashore or reside in the United States." Immigration and Naturalization Service Form 1–174.

2. "You may not be paid off or discharged in the U.S. In no event is stay au-

thorized beyond 29 days. * * * You are required to depart from each port of the U. S. on the next sailing of named vessel.

"By accepting this conditional permit to land the holder agrees to all the conditions incident to the issuance thereof, and to deportation from the United States in accordance with the provisions of section 252(b) of the Immigration and Nationality Act." Crewman's Landing Permit Form 1–95A.

satisfy the requirement that an alien be "within the United States". The statute is applicable only to aliens who have entered the United States in contemplation of law. Aliens who have been excluded from entry, therefore, are not eligible for the relief it affords. Leng May Ma v. Barber, 1958, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246; Rogers v. Quan, 1958, 357 U.S. 193, 78 S.Ct. 1076, 2 L.Ed.2d 1252.

■ Consequently, relator has no standing to apply for asylum under § 243 (h) unless he has entered the United States. "The term 'entry' means any coming of an alien into the United States, from a foreign port or place * * * whether voluntarily or otherwise * * " (8 U.S.C.A. § 1101(a) (13)). Thus, a seaman permitted to land upon arrival from a foreign port makes an entry. United States ex rel. Claussen v. Day, 1929, 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758; United States ex rel. Stapf v. Corsi, 1932, 287 U.S. 129, 53 S.Ct. 457, 76 L.Ed. 929.

This is not a case, therefore, of mere physical presence. We are dealing here not with an alien excluded from entry or held on the threshold in parole pending determination of his right to enter, as in Leng May Ma v. Barber, supra, and Rogers v. Quan, supra, but with an alien crewman "permitted to land temporarily in the United States (8 U.S.C.A. § 1282 (a) (1)) [3] after applying for a permit "to facilitate [his] entry into the United States as a crewman" (Immigration and Naturalization Service Form 1–174, supra). In this connection, it is worth not-

ing that the challenged deportation order expels relator "from the United States".

Thus, there can be no question that relator fits the letter of the statute. Implicitly conceding as much, the Immigration Service argues that it is of no moment that relator was given a permit to land in the United States six days before its revocation. According to the Immigration Service, relator's open request for asylum and avowed hope to stay in the United States makes him a mala fide crewman who, in effect, was detained on board his ship. Thus, it is urged, relator is an excluded alien *ab initio* and ineligible for the benefactions of § 243(h) under the rule of Leng May Ma v. Barber, supra. The contention rests on a fiction not supported by the facts nor justified by the plain purpose of § 243(h).

■ It is, of course, true that when an alien crewman obtains a temporary landing permit by concealing a ripened intention to remain here permanently without lawful permission, he perpetrates a fraud upon the Immigration authorities which vitiates his landing permit. United States ex rel. Tsevdos v. Reimer, 2 Cir., 1940, 108 F.2d 860. Cf., Sleddens v. Shaughnessy, 2 Cir., 1949, 177 F.2d 363. 8 U.S.C.A. § 1282(b).

■ The undisputed facts show, however, that at the time he obtained his permit, relator's intentions with respect to remaining in the United States were neither formed nor fraudulent. There is nothing in the transcript of his sworn statement before the Immigration authorities to show that on the voyage in question he intended to come to this

3. 8 U.S.C.A. § 1282(a) (1) provides:
"§ 1282. Conditional permits to land temporarily—Period of time
"(a) No alien crewman shall be permitted to land temporarily in the United States except as provided in this section and sections 1182(d)(3), (5) and 1283 of this title. If an immigration officer finds upon examination that an alien crewman is a nonimmigrant under paragraph (15) (D) of section 1101(a) of this title and is otherwise admissible and has agreed to accept such permit, he may, in his discretion, grant the crewman a

conditional permit to land temporarily pursuant to regulations prescribed by the Attorney General, subject to revocation in subsequent proceedings as provided in subsection (b) of this section, and for a period of time, in any event, not to exceed—
"(1) the period of time (not exceeding twenty-nine days) during which the vessel or aircraft on which he arrived remains in port, if the immigration officer is satisfied that the crewman intends to depart on the vessel or aircraft on which he arrived; * * *."

country for permanent residence, or that he formed any such intention any time prior to going ashore, as in United States ex rel. Feretic v. Shaughnessy, 2 Cir., 221 F.2d 262, certiorari denied 1955, 350 U.S. 822, 76 S.Ct. 49, 100 L.Ed. 735, on which the Immigration Service relies. On the contrary, his statement, despite his struggles with a foreign tongue, shows unequivocally that he did not form an intention to remain in the United States until after he came ashore and was within the United States. Even then, his intention was to remain here only if he were permitted to do so by the law of the land.[4] Indeed, his very first act in coming ashore was to appeal to the Federal Bureau of Investigation for help in obtaining asylum. This is not the act of a mala fide crewman but convincing evidence of his good faith. Surely there can be nothing mala fide or fraudulent in a stranger's frankly explaining his plight and openly asking guardians of the law for help. A mala fide crewman, obviously, would hide out and conceal his intentions until after his ship departed. Paradoxically but unquestionably, his deceit would then be rewarded, despite his illegal presence in our country, not only with a plenary deportation hearing under § 242 of the Act, 8 U.S.C.A. § 1252 (Couto v. Shaughnessy, 2 Cir., 218 F.2d 758, certiorari denied 1955, 349 U.S. 952, 75 S.Ct. 879, 99 L.Ed. 1276, but also a separate hearing if he claimed asylum under § 243(h) (United States ex rel. Ratkovic v. Esperdy, D.C.E.D.N.Y.1960, 185 F.Supp. 806). It cannot be that crewmen who break the law are entitled to greater rights under § 243(h) than those who observe it.

That relator entertained a desire or hope to take advantage of any opportunity afforded him by the laws of this country to remain here, if such an op-

---

4. "Q. At the time you left Gdynia on the M/V 'Olesnica', did you intend to return to Poland? A. Well, when it comes to my intentions, it is like this. I had always wanted to leave Poland but just after we left the port of Gdynia I was not thinking of leaving the ship. However, as soon as we came to the United States and I saw this city and its life, I decided to stay.

"Q. Well, then, so far as you know at this time your wife and child are expecting your return to Gdynia; is that right? A. Yes.

"Q. Did you discuss with your wife before you left the possibility that you might desert the ship? A. We talked about the necessity of getting a good job in order to provide for the family. We did not talk about distant future plans.

"Q. Well, wasn't there something more than the mere appearance of New York City which caused you to decide to desert your ship? A. No. This was one of the motives which caused my desertion but there was behind it a firm decision to break away from the Communist society.

    *    *    *    *    *

"Q. Do you have any reason to believe that if you fail to return to Poland you will ever be reunited with your family? A. I don't know how well you are versed in the Polish domestic conditions but my return to Poland amounts to a rub-out.

"Q. Well, understanding what you said and also understanding what you have said about your feelings toward your wife and son, I am still unable to see how you could bring yourself to desert your ship and possibly worsen the lot of your wife and son. Can you explain this? A. I am not certain here with my own safety. I am fully convinced that I am in a safe place because I am in the United States, but I am worried about my wife's safety because she will be interrogated without an end. Eventually, however, I hope that I will be able to get some political rights here like so many other Polish seamen who deserted and finally got the right to remain here permanently in the United States. What then? Well, eventually the Polish Government will even consent to let my wife and son join me because vengeance is one thing and burden on the country is another thing. How long will they support the two of them when I am more than anxious to bring them over here and resume my obligations as head of the family.

"Q. Did you discuss this possibility with your wife before you left Poland? A. No.

    *    *    *    *    *

"Q. At the time you appeared at this office several days ago to be fingerprinted, had you already made up your mind to desert your ship? A. Yes."

portunity should exist, does not reek of fraud or smack of illegal entry. Cf., Brownell v. Stjepan Bozo Carija, 1957, 102 U.S.App.D.C. 379, 254 F.2d 78 and Brownell v. Gutnayer, 1954, 94 U.S.App. D.C. 90, 212 F.2d 462.

In the Carija case, the court held that aliens in transit in good faith through the United States to Paraguay did not enter this country illegally upon their transit visas, notwithstanding that they also entertained an intent to take advantage of an opportunity afforded to them by the laws of the United States to remain here permanently, if possible, under the Displaced Persons Act, 50 U. S.C.A.Appendix, § 1951 et seq. Similarly, in Gutnayer, the court held that the entry of a duly accredited official of a foreign government was not unlawful despite his intent to remain in the United States.

So, in the instant case, in the light most favorable to the Immigration Service, the facts reveal no more than an intention by relator to seek asylum while on lawful shore leave. Necessarily, such a purpose could be nothing more than a hope. The case, therefore, is not that of a mala fide ship-jumper, but one of a bona fide crewman seeking only what the law permits. Thus, there is no merit in the contention that in legal effect relator is an excluded alien ineligible for the relief afforded by § 243(h).

The Immigration Service persists, however, that even though relator may qualify as an alien within the United States, he nevertheless is subject to summary deportation on the alternative ground that after his arrival, but before his ship left port, he formed an intention not to depart on the ship which brought him.

Here, the Immigration Service lays hold of relator's request for asylum, his failure to report on board when his ship sailed coastwise, and his hope to remain here permanently as proof of his intention not to depart on the vessel which brought him. This is enough, the Immigration Service urges, to subject relator to summary deportation, pursuant to § 252(b) of the Immigration and Nationality Act (8 U.S.C.A. § 1282(b)) and its implemental regulations (8 C.F.R. § 252.2). Section 252(b) provides in relevant part that: "Pursuant to regulations prescribed by the Attorney General, any immigration officer may, in his discretion, if he determines that an alien is not a bona fide crewman or does not intend to depart on the vessel * * * which brought him, revoke the conditional permit to land which was granted such crewman * * *, take such crewman into custody, and require the master or commanding officer of the vessel * * on which the crewman arrived to receive and detain him on board such vessel * * *, if practicable, and such crewman shall be deported from the United States * * *. Nothing in this section shall be construed to require the procedure prescribed in section 1252 of this title (Section 242 of the Act) to cases falling within the provisions of this subsection."

There is no gainsaying that the statute authorizes an Immigration officer, in his discretion, to order deportation of an alien crewman upon a finding that he does not intend to depart on the vessel which brought him. Nor is there any doubt that the statute explicitly denies such a crewman the ordinary deportation hearing prescribed in § 242 of the Act.

Reliance by the Immigration Service upon § 252(b) as authority for summary expulsion here, however, is misplaced. It is by no means clear that an intention to take advantage of a lawful opportunity for asylum negates a crewman's intention to depart on the vessel which brought him, for it might well be possible, as far as he knows, for his application to be heard and resolved, one way or the other, before his ship leaves the United States. Nevertheless, on the undisputed facts, particularly relator's failure to report on board when his ship sailed for Philadelphia, it cannot be said that the Immigration officer abused his discretion or acted arbi-

trarily or unfairly in finding that relator did not intend to depart on the ship which brought him. In the absence of a strong showing of such abuse, it is not the function of the court to substitute its judgment for that of the Immigration official. Savelis v. Vlachos, D.C.E. D.Va.1955, 137 F.Supp. 389, 396 and authorities there cited. Accordingly, his finding of deportability is accepted in this court.

█ It does not follow, however, that a right to a hearing on whether deportation should be withheld under § 243(h) goes down before the onslaught of the summary deportation powers of § 252 (b). It should be noted at the outset that, although that section expressly denies an ordinary deportation hearing upon a finding by an Immigration officer that a crewman does not intend to depart on his ship, it does not preclude the special hearing based on a claim for asylum prescribed by regulation (8 C.F.R. § 243.-3(b)) promulgated under § 243(h). Thus, there is nothing in the letter of § 252(b) repugnant to the provisions of § 243(h).

█ The Immigration Service argues, however, that the statute's express denial of an ordinary deportation hearing shows a clear legislative purpose also to deny a special hearing on a claim for asylum. That argument, more convincingly, proves only that Congress knows how to deny a hearing if it intends to do so.

As we have seen, the benefactions of § 243(h) extend to "any alien", a strikingly inappropriate term to express a Congressional will to except alien crewmen from the hearing afforded by its implemental regulations. Surely the exception, the Immigration Service claims, is not to be implied in the teeth of the broad bounty proclaimed by § 243(h) merely because another section of the same statute denies a different kind of hearing to ordinary ship-jumpers.

Prompt and summary deportation, we are told, is necessary and traditional for all crewmen who desert while their ship is in port in order to cope with the problem of ship-jumping and the consequent stranding of foreign flagships. Whatever the scale or weight of these and other background problems, this is the wrong forum for such arguments. It is not the business of the courts to pass on the wisdom of statutes. Nor is it their function to rewrite legislation. Yet, in order to reach the result urged, we are asked to compound one error with another by adding words not only to § 252(b) but to § 243(h) as well.

Unless we are to treat § 243(h) as a mouthing of sterile platitudes, its plain purpose is not to reduce, but to increase, an alien's opportunity to be heard before he is deported to a country which he claims will subject him to physical persecution. Surely in our struggle to win the minds of men, we do not set an obstacle course for aliens on our shores courageous enough to choose our way of life over Communist tyranny at the peril of life or limb. The plain purpose of the statute is to provide a path to freedom from physical persecution. This is the more evident when the statute is set against the shortcomings of the background law which denied a right of asylum, however sympathetic the alien's plight or meritorious his claim for refuge. United States ex rel. Von Kleczkowski v. Watkins, D.C.S.D.N.Y.1947, 71 F.Supp. 429; Ex parte Kurth, D.C. S.D.Cal.1939, 28 F.Supp. 258 (both decided before the enactment of § 243(h)).

Manifestly, a power of summary expulsion, which in the circumstances might be tantamount to a death sentence, on the mere say-so of some official, is so inimical to our way of life that it should not be found unless clear statutory language or evident legislative purpose compels it. There is no such compulsion here. On the contrary, compelling reasons point the other way. It is one thing to deny a hearing to ordinary ship-jumpers but quite another where life itself may be at stake. Fear of grim consequences not present in the case of ordinary ship-jumpers undoubtedly accounts for the fact that claims for asylum under § 243(h) are clothed with special procedural safeguards.

There is a dearth of legislative history[5] relevant to § 243(h), but what little there is shows a legislative dread that deportation for some aliens might well amount to a death sentence. To accord a hearing in such circumstances is not alone to advance the cause of the alien, but our own ideals of democratic justice as well. To deny one is to rob this remedial legislation of its vitality and, worse, to transform it into an instrument of oppression. The statute proclaims that we stand ready, if not to grant, at least to hear claims for asylum from physical persecution. The value of the opportunity will most certainly pale if resort to the statutory promise is to be met as it was here with prompt delivery of the applicant into the hands of his oppressors. This is enough to make brave men blanch before attempting to realize hopes nourished by the statute itself. Certainly § 243(h) cannot be read as presenting those who seek its protection with the terrifying prospect, under § 252(b), of immediate and certain expulsion to the dread consequences which § 243(h) was designed to prevent. Surely we cannot assume that Congress gave with one hand but took with the other. The plain course is not to erect a conflict between § 243(h) and § 252(b) where none exists, but to construe them in harmony with each other so far as to preserve the right to a hearing on a claim based on § 243(h). Rosenberg v. United States, 1953, 346 U.S. 273, 294, 73 S.Ct. 1152, 97 L.Ed. 1607; New Lamp Chimney Co. v. Ansonia Brass & Copper Co., 1875, 91 U.S. 656, 663, 23 L.Ed. 336.

Finally, the Immigration Service, pointing to relator's Communist background, argues that this is not a meritorious case. Relator notes, on the other hand, that only crewmen above suspicion are permitted to sail on vessels plying western ports. However that may be, there is no doubt that the Immigration officer acted from a sense of duty on facts which, if they survived a hearing, might well justify his suspicions as to relator's sincerity and warrant remanding him to the Master of his ship. But that is not the question.

■ The question, at this stage of the case, is not whether relator's claim for asylum should be granted or refused, but whether he is entitled to be heard. An alien's opportunity to remain in the United States is a privilege which Congress may grant. It has seen fit to extend an opportunity to win that privilege to any alien within our country if facts developed on a hearing convince the Attorney General that he will be subject to physical persecution if deported. This is not a matter of favor but of right. It,

5. The legislative history of the Immigration and Nationality Act of 1952 sheds little light on § 243(h). Its humanitarian purpose, however, had already been accepted in an earlier attempt to modify the 1917 Act. In 1950, the Hobbs Bill, H.R. 10, was introduced in the House of Representatives to confer greater discretion in the Attorney General in designating countries to which aliens might be deported. H.R. 10 was silent, however, on the possibility that for some deported aliens the order of deportation would be, in effect, a death sentence. During the House debates, that fear was relied on as an argument against passage of the bill. 96 Cong.Rec. 10454. The bill, however, passed the House on July 17, 1950, 96 Cong.Rec. 10460, and reached the Senate where it was referred to the Senate Committee on the Judiciary which favorably reported it with amendments on August 3, 1950. The Committee, apparently in deference to the fears expressed in the House, amended the bill to prohibit deportation to any country where the alien would be subjected to physical persecution. The amendment read, "No alien shall be deported *under any provision of this Act* to any country in which the Attorney General shall find that such alien would be subjected to physical persecution." S.R. 2239, 96 Cong. Rec. 11724. H.R. 10, as amended, was consolidated with four related bills into an omnibus bill, S. 4037, 96 Cong.Rec. 12145, which was then replaced by H.R. 9490, section 23 of which contained the pertinent language of H.R. 10 as an amendment to section 20 of the 1917 Act. 96 Cong.Rec. 14628. H.R. 9490, the Internal Security Act of 1950, was ultimately enacted into law over the President's veto on September 23, 1950. 96 Cong. Rec. 15726.

500

therefore, does not lie within the discretion of an Immigration official, however well intentioned, to withhold the right to be heard from any alien eligible for relief under § 243(h) and its implemental regulations (8 C.F.R. § 243.3(b)). In denying that right here, the Immigration officer was wielding a power he did not possess. This was plain error of law subject to judicial review. Cf., McGrath v. Kristensen, 1950, 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173; United States ex rel. Accardi v. Shaughnessy, 1954, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681.

Accordingly, the writ of habeas corpus was sustained, relator was released on his own recognizance (Rule 49(3), Supreme Court Rules, 28 U.S.C.A.), and the order of deportation stayed pending a hearing and determination by the Attorney General of relator's application for relief under § 243(h).